RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ELEM RAY FULCHER,

                _Petitioner-Appellant,_

    _v._

JOHN MOTLEY, Warden,

                _Respondent-Appellee._

No. 03-6216

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 02-00674—Charles R. Simpson III, District Judge.

Argued: December 2, 2005

Decided and Filed: April 18, 2006

Before: CLAY and COOK, Circuit Judges; OLIVER, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Chad A. Readler, JONES DAY, Columbus, Ohio, for Appellant. Ian G. Sonego, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Chad A. Readler, Marc A. Fulkert, JONES DAY, Columbus, Ohio, for Appellant. Ian G. Sonego, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. Gerald L. Gulley, Jr., GULLEY OLDHAM, PLLC, Knoxville, Tennessee, for Amicus Curiae.

      COOK, J., delivered the opinion of the court, in which OLIVER, D. J., joined. CLAY, J. (pp. 18-34), delivered a separate concurring opinion.

_____

**OPINION**

_____

      COOK, Circuit Judge. Elem Ray Fulcher, currently serving a life sentence for murder, burglary, and robbery, appeals the denial of his petition for a writ of habeas corpus. The evidence against Fulcher included statements from a police station interview with his then girlfriend, Patricia Sue Ash, taped soon after the crime. The couple later married; Ash invoked marital privilege under

_____

[*] The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1

Kentucky law[1] and was thus unavailable for cross-examination at Fulcher's trial. Fulcher contends that the admission of Ash's statements violated his rights under the Sixth Amendment's Confrontation Clause, according to both the clearly established law at the time and the later case of *Crawford v. Washington*, 541 U.S. 36 (2004), which he argues should apply retroactively. We find that the admission of Ash's statements did violate Fulcher's clearly established rights and that the error was not harmless. We thus **REVERSE** and **REMAND** to the district court for entry of the writ.

## I. Factual and Procedural Background

### A. Factual History

On December 22, 1991, Charlie Bramer was found beaten and stabbed to death in his home in Jefferson County, Kentucky. In April 1994, Fulcher was convicted of burglary, robbery, and Bramer's murder. The prosecution's case substantially consisted of the testimony of Terry Wright, Fulcher's friend and alleged accomplice, the police interview with Ash, the testimony of two inmates to whom Fulcher admitted committing the murder, and the testimony of a third inmate, to whom Fulcher offered $500 to provide an alibi. No murder weapon was found, and Fulcher's fingerprints were not discovered at the crime scene.

Wright's testimony supplied the bulk of the facts. He and Fulcher were drinking and watching football at Fulcher's house on the day of the crime. The two then went for a drive and decided to go to the home of Charlie Bramer to steal some money. They entered the home while Bramer lay asleep on the couch; Wright watched Bramer, and Fulcher searched the bedroom. Wright then heard a car come down the driveway. He went to the front door to look out and accidently hit the security chain on the door, waking Bramer. Wright ran out, taking the front door key with him, and got into Fulcher's car. Fulcher joined him. Bramer came out, walked over to the car, reached inside, and smacked Fulcher on the head.

Fulcher asked Bramer if he could talk to him for a minute, and the two walked back into the house. Wright initially stayed in the car but then went inside to find Fulcher hitting Bramer in the head with a hammer. Wright testified that there was nothing he could do to stop Fulcher. Wright again ran out, wiped his fingerprints off of the front door, and returned to the car. Three or four minutes later, Fulcher returned covered in blood. He told Wright, "This makes us tighter than anybody," and then drove Wright home. Fulcher told Wright that he killed Bramer because Bramer would otherwise have been able to identify them.

On January 2, 1992, Patricia Sue Ash was pulled over in a car matching the description of Fulcher's vehicle. The police took her to the station for questioning, at which point she provided the taped interview that lies at the heart of this appeal. Ash stated in the interview that sometime before Christmas Fulcher asked her to wash a pair of grey sweatpants that had blood on them—the result, Fulcher said, of a fight in which he and Wright had been involved. She stated that later Wright asked her to dispose of a key that she did not think belonged to her, Wright, or Fulcher. Ash could not recall whether Fulcher was present for the discussion, but Wright later testified that he was. Ash admitted that she threw the key into a sewer, where it was recovered by the police.

William Mucker and Nick Mantilli, state inmates, testified that Fulcher admitted to each of them that he killed Bramer. In addition, Mucker, who had known Fulcher before the murder and who was an inmate with Fulcher, testified that Fulcher told him to see him after Mucker's release.

---

[1] Kentucky's pre-1992 rules of evidence, including the marital privilege in KY. REV. STAT. ANN. § 421.210(1), *see Sloven v. Commonwealth*, 962 S.W.2d 845, 851 (Ky. 1997), are carried forward for later trials of pre-1992 crimes by Kentucky Rule of Evidence 107(b) (2005).

Fulcher would then tell Mucker where the murder weapons were located, and Mucker would dispose of them. Another inmate, Norman Lewis, testified that Fulcher offered him $500 to provide an alibi.

## B. Litigation History

*Basic Procedural History.* Fulcher was convicted of murder, first degree robbery, and first degree burglary. He directly appealed his conviction to the Kentucky Supreme Court, arguing that (1) the trial court denied him a fair trial by not granting a mistrial after Wright volunteered from the stand that he had taken a polygraph test; (2) the trial court denied him due process by failing to instruct the jury on lesser offenses, including manslaughter, second degree burglary, and theft by unlawful taking; and (3) the trial court denied him a fair trial and violated his Sixth Amendment right to confront witnesses by admitting Ash's tape-recorded statements.

The Kentucky Supreme Court rejected all of Fulcher's arguments on the merits. The court affirmed the conviction on June 20, 1996, and it denied his petition for rehearing on August 26. On August 15, 1997, Fulcher moved in the state trial court to vacate his sentence pursuant to Kentucky Rule of Criminal Procedure 11.42, alleging various instances of ineffective assistance of counsel. The trial court denied the motion, and on May 25, 2001, the Kentucky Court of Appeals affirmed the denial. Fulcher then petitioned the Court of Appeals for a rehearing. The Court of Appeals denied his petition on August 10, 2001. A year later, on August 14, 2002, the Kentucky Supreme Court denied his motion for discretionary review of the Court of Appeals's decision. On November 7, 2002, he filed this petition for a writ of habeas corpus in the United States District Court for the Western District of Kentucky.

Fulcher raised the same three arguments in his habeas petition as he had on direct review: lack of a fair trial stemming from Wright's "lie detector" statement; lack of a fair trial and due process violations from failure to instruct the jury on the lesser offenses; and, most relevant to this appeal, lack of a fair trial and violation of his Sixth Amendment confrontation right by the admission of Ash's statements. A federal magistrate judge recommended denying Fulcher's petition. He found that although Fulcher had preserved his Sixth Amendment challenge, habeas relief was inappropriate because the Kentucky Supreme Court's decision was neither "clearly contrary to" nor "an unreasonable application of" the United States Supreme Court precedent in *Chambers v. Mississippi*, 410 U.S. 284 (1973). The district court accepted the magistrate's recommendations, dismissed Fulcher's petition, and denied his request for a certificate of appealability.

On September 3, 2003, Fulcher filed his notice of appeal, followed by a request for a certificate of appealability from this court. On August 19, 2004, this court granted Fulcher the certificate "regarding the issue of whether his rights under the Confrontation Clause were violated when a tape-recorded statement was admitted into evidence."

*Preservation of his Sixth Amendment Argument.* Because Kentucky contends that Fulcher has waived the Confrontation Clause challenge he raises in this appeal, we consider his filings with respect to the issue.

Prior to trial, Fulcher filed a motion in limine to exclude Ash's statements, arguing, among other things, that their admission would violate his Confrontation Clause right as defined by *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) (holding that the Sixth Amendment requires that hearsay statements have "indicia of reliability"—*i.e.*, either fall into a "firmly rooted hearsay exception" or have "particularized guarantees of trustworthiness"), *Lee v. Illinois*, 476 U.S. 530, 541 (1986) (holding that inculpatory hearsay statements by accomplices are "presumptively unreliable"), and *Idaho v. Wright*, 497 U.S. 805, 822 (1990) (holding that to have "particularized guarantees of trustworthiness," hearsay evidence "must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial"). Fulcher also cited the Kentucky case

of *Taylor v. Commonwealth*, 821 S.W.2d 72 (Ky. 1990), which allowed an unavailable party's confession to be admitted against his alleged accomplice, for the proposition that a non-testifying codefendants's confession is presumptively unreliable. As discussed below, the more relevant holding in *Taylor* was that statements against penal interest may only be admitted based upon a four-factor test of trustworthiness.[2] Fulcher did not cite that test in his motion.

Next, as recounted in his brief on direct appeal before the Kentucky Supreme Court (J.A. 54), Fulcher objected to the admission of Ash's statements before and throughout the trial. The brief offers few specifics as to the content of those objections, other than noting that the pretrial objection was "overruled by the trial court as to . . . whether or not the statement qualified as being one against Ms. Ash's penal interest."

The section of the brief recounting these pretrial and trial objections was entitled, "THE TRIAL COURT ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE AND DENIED APPELLANT HIS RIGHT TO A FAIR TRIAL AND HIS RIGHT TO CONFRONT WITNESSES AGAINST HIM UNDER THE SIXTH AMENDMENT . . . WHEN IT ALLOWED, OVER APPELLANT'S OBJECTION, THE ADMISSION OF THE HEARSAY STATEMENT OF PATRICIA SUE ASH FULCHER." (J.A. 54.) In that section, Fulcher set out the facts underlying his Sixth Amendment challenge: During a police interrogation, Ash gave a statement that was later admitted at trial; Ash did not testify at trial, and she was never subjected to cross-examination. In the brief, Fulcher did not expressly address *Roberts*, *Lee*, or *Wright*. Instead he argued that the trial court erred by failing to apply *Taylor*'s four-factor test to Ash's statements. (J.A. 60-61.)

In his habeas petition, Fulcher asserted that "Petitioner suffered substantial prejudice that deprived Petitioner of a fair trial and his right to confrontation under the Sixth Amendment . . . when the trial court allowed over Petitioner['s] objection, the admission of the hearsay statement of Patricia Sue Ash Fulcher." (J.A. 15.) The petition offered no further detail.

Then, in his objections to the magistrate's report, Fulcher argued for the first time that *Taylor*, which he himself had several times cited, was the wrong legal standard to apply to his case—and specifically that the magistrate's report, because it relied on *Taylor*, was contrary to the clearly established federal law in *Roberts*, *Lee*, *Wright*, *Lilly v. Virginia*, 527 U.S. 116 (1999), and *Williamson v. United States*, 512 U.S. 594 (1994). Fulcher also argued, though less emphatically, that Ash's statements did not "meet the high standard for admissibility as outlined in *Chambers v. Mississippi*." (J.A. 232.)

Fulcher's brief in this appeal focuses squarely on the inconsistency of the proceedings below with Sixth Amendment Confrontation Clause jurisprudence—under both *Crawford* and pre-*Crawford* case law.

## II. Analysis

### A. Fulcher Did Not Waive His Sixth Amendment Arguments as to Either *Crawford* or its Predecessors

Kentucky contends that Fulcher waived his current Confrontation Clause arguments because on direct appeal he failed to "[argue] that the *Taylor* case was incorrectly decided or applied an erroneous constitutional standard." (Appellee's Br. 23.) Indeed, "[t]he only two cases that Fulcher

---

[2]*Taylor* requires courts considering the admissibility of hearsay statements against penal interest to examine: "(1) [t]he time of the declaration and the party to whom made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is against the declarant's penal interest; and (4) the availability of a declarant as a witness." 821 S.W.2d at 74.

asked the Kentucky Supreme Court to apply on direct appeal were [*Chambers*] and [*Taylor*]." (*Id.*) Kentucky contends accordingly that "[the court] cannot be faulted for applying the very precedents that Fulcher asked it to apply to his case" (emphasis removed) and moreover that "habeas relief is not available when the petitioner or his counsel invited the error about which he complains." (Appellee's Br. 24 (citing *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998); *Fields v. Bagley*, 275 F.3d 478, 485 (6th Cir. 2001) (citation omitted)).) Kentucky also contends that Fulcher has waived his current Confrontation Clause arguments because his objections to the magistrate's report argued that *Chambers* did apply to his case, but was misapplied by the Kentucky Supreme Court. (Appellee's Br. 24.)

### 1. Waiver Standard

*Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003), provides a thorough account of the Sixth Circuit requirements for preserving constitutional claims:

> Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not "fairly presented" to the state courts. A claim may only be considered "fairly presented" if the petitioner asserted both a factual and legal basis for his claim in state court. Although general allegations of the denial of a "fair trial" or "due process" have been held insufficient to "fairly present" federal constitutional claims, a petitioner need not recite "book and verse on the federal constitution."

> A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."

(Citations omitted.) Finding that Newton's brief "provided a detailed recitation of the facts and specifically stated that the trial court's refusal to instruct the jury on the issue of self-protection against multiple aggressors 'violated [his] right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution,'" *id.* (citation omitted), the court found his constitutional arguments preserved.

### 2. As Applied to the Facts Here

Fulcher did not waive his Confrontation Clause arguments because at every stage of the process, he took some combination of the four actions discussed in *Newton*. In each of his briefs Fulcher asserted that the admission of Ash's statements violated his rights under the Confrontation Clause—"terms sufficiently particular to allege a denial of a specific constitutional right." *Id.* And each "alleg[ed] facts well within the mainstream of constitutional law," *id.*, specifically, that Ash's out-of-court statements were asserted for their truth, and that she was unavailable for cross-examination. That he cited the wrong cases in support of his constitutional claim is no basis for default. Since "[t]here is *no* requirement that the petitioner cite to cases that employ federal constitutional analysis where he has phrased his claim in terms of a denial of a specific constitutional right," *Newton*, 349 F.3d at 877 (emphasis added), penalizing a party for citing the wrong cases would create the perverse incentive to cite no cases at all. *Cf. Carter v. Bell*, 218 F.3d 581, 606 (6th Cir. 2000) ("We do not require word-for-word replication of the state claim in the habeas corpus petition in order to address the merits therein, only that the petitioner 'fairly present' the substance of each of his federal constitutional claims to the state courts.").

As for the "invited error doctrine," Fulcher's reply brief correctly notes that "the invited error doctrine applies only where a defendant affirmatively seeks a ruling from a trial court and then later asserts that the ruling he requested was erroneous." (Reply Br. 8.) *See United States v. Sharpe*, 996 F.2d 125, 129-30 (6th Cir. 1993) (defendant, having convinced the court that he was not guilty under one statute, was barred from later arguing that a second statute could not apply to his conduct because the first one already did); *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) (plaintiff, after requesting a jury verdict, was barred from asserting the impropriety of that verdict); *All Am. Life and Casu. Co. v. Oceanic Trade Alliance Council Int'l, Inc.*, 756 F.2d 474, 479-80 (6th Cir. 1985) (refusing to exclude otherwise inadmissible evidence because the plaintiff had "invited" witnesses to make the references it later sought to exclude); *see also Fields*, 275 F.3d at 485 (finding no invited error where respondent charged that petitioner's counsel had intentionally left petitioner without appellate counsel so as to create a basis for reversal by the Supreme Court); *Leverett v. Spears*, 877 F.2d 921, 924 (11th Cir. 1989) (petitioner may not allege fundamental error in jury instructions he himself argued for and submitted). Kentucky points to no use of the "invited error" doctrine to prevent a plaintiff from re-arguing a constitutional claim that he previously argued *incorrectly* by citing the wrong precedent.

We thus find that Fulcher has preserved his argument that the admission of Ash's statements violated his Confrontation Clause rights.

### B. The Kentucky Supreme Court's Decision Violated Clearly Established Federal Law

#### 1. Habeas Standard

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court may only grant a prisoner's petition for a writ of habeas corpus if it finds that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).[3] "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "[a] state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court *applies a rule* that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 405 (emphasis added). For example, a habeas petition could be granted if, in spite of the rule in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)—that a petitioner urging ineffective assistance of counsel need only show a "reasonable probability" of prejudice—a state court required the petitioner to show prejudice by a preponderance of the evidence. *Williams*, 529 U.S. at 405-06. When a state court commits such an error, "a federal court [is] unconstrained by § 2254(d)(1)," *id.* at 406, and de novo review is appropriate. *See Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001).

#### 2. The Kentucky Supreme Court's Decisional Rule Was Contrary to Clearly Established Federal Law, Therefore De Novo Review Is Appropriate

*The Clearly Established Law*. The Confrontation Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. At the time of the Kentucky Supreme Court's ruling in 1996, Confrontation Clause challenges were analyzed according to the rule in *Ohio v. Roberts*—that hearsay statements by unavailable declarants were only admissible if they bore "adequate indicia of reliability," by

---

[3]Fulcher does not put forth an argument under the "unreasonable application" clause.

either 1) "fall[ing] within a firmly rooted hearsay exception," or 2) possessing "particularized guarantees of trustworthiness." 448 U.S. 56, 66 (1980). As for the first possibility, the Supreme Court "[had] recognized that statements admitted under a 'firmly rooted' hearsay exception [were of a sort] so trustworthy that adversarial testing would add little to their reliability," *Idaho v. Wright*, 497 U.S. 805, 820-21 (1990). For example, dying declarations were declared admissible by the 1895 case of *Mattox v. United States*—notwithstanding the obvious Confrontation Clause problems—because "the sense of impending death [was] presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath." 156 U.S. 237, 244. As for the second possibility, statements bearing "particularized guarantees of trustworthiness," such statements had to be "at least as reliable as evidence admitted under a firmly rooted hearsay exception," *Wright*, 497 U.S. at 821; and in assessing that reliability, courts were forbidden to consider corroborating evidence. *Id.* at 822 (rejecting the "contention that evidence corroborating the truth of a hearsay statement [could] properly support a finding that the statement bears 'particularized guarantees of trustworthiness'"). Instead, "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant [had to] possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.*

By the time of Fulcher's direct appeal, the Supreme Court had several times examined the hearsay exception for statements against penal interest. In *Lilly v. Virginia*, 527 U.S. 116, 133 (1999),[4] a case following Fulcher's direct appeal, the court identified three situations in which declarations against penal interest were offered into evidence: "(1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims the *declarant* committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." *Id.* at 127. We discuss each category in turn, and on the basis of *Hill v. Hofbauer*, 337 F.3d 706 (6th Cir. 2003) (discussed below), we hold first that "accomplices' confessions that inculpate a defendant," *Lilly*, 527 U.S. at 134, were not admissible under a firmly rooted hearsay exception according to the clearly established law at the time of Fulcher's direct appeal.

The court in *Lilly* noted that statements in the first category, "voluntary admissions against the declarant," "carr[ied] a distinguished heritage confirming their admissibility." *Id.* at 127 (citations omitted). But when the admission of such statements risked inculpating another person (such that they would border on the third category), they had been held inadmissible. *Id.* at 128 ("[W]e have consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person."); *see Bruton v. United States*, 391 U.S. 123 (1968) (ordering a new trial even after the jury had been instructed to consider one codefendant's confession as evidence only against him, and not against the other codefendant); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("Where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."); *Gray v. Maryland*, 523 U.S. 185 (1998) (applying *Bruton* to bar the admission of a non-testifying codefendant's confession even after the name of the other defendant had been redacted from it). According to the court in *Lilly*, the logic of such decisions was that "because the use of an accomplice's confession 'creates a special, and vital, need for cross-examination,' a prosecutor desiring to offer such evidence must comply with *Bruton*, hold separate trials, use separate juries, or abandon the use of the confession." 527 U.S. at 128 (quoting *Gray*, 523 U.S. at 194-95 (1998)).

---

[4]Though this was a plurality opinion, it was nonetheless the opinion of the court, as the remaining two justices (Scalia and Thomas) believed that the Confrontation Clause barred a *broader* range of statements against penal interest than did the majority. *See Murillo v. Frank*, 402 F.3d 786, 791 (7th Cir. 2005). Kentucky is wrong to suggest otherwise.

Statements in the second category, which were inculpatory to the declarant but exculpatory to the defendant, raised different constitutional concerns. Because they were offered by the accused, their admission did not implicate Confrontation Clause concerns; rather, their *exclusion* threatened *Due Process* protections. This was the message of *Chambers v. Mississippi*, 410 U.S. 284 (1973), which held that the Due Process Clause affords criminal defendants the right to introduce into evidence third parties' declarations against (their own) penal interest when the statements were made under circumstances that "provided considerable assurance of their reliability." *Id.* at 300. The Kentucky Supreme Court in the *Taylor* case read *Chambers* to require that hearsay statements against penal interest be measured according to four factors: "(1) The time of the declaration and the party to whom made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is against the declarant's penal interest; and (4) the availability of a declarant as a witness." 821 S.W.2d at 74. But note the substantial difference in how the tests were applied: The test was created in *Chambers* to cabin the protections afforded to defendants by the Due Process Clause (due process prevents hearsay rules from barring the introduction of certain *very reliable* exculpatory confessions); it was applied by Kentucky in *Taylor* to allow the prosecution to offer inculpatory statements (category *three*) that the Kentucky court believed sufficiently reliable to not offend the Confrontation Clause. *See Taylor*, 821 S.W.2d at 75-76.[5]

The third category included cases, like Fulcher's (and Lilly's), where the government sought to introduce "a confession by an accomplice which incriminate[d] a criminal defendant." *Lee v. Illinois*, 476 U.S. 530, 544 n.5 (1986). The court in *Lilly* first cited *Lee*'s holding that such statements were "presumptively unreliable." 527 U.S. at 131 ("[O]ver the years . . ., the Court has 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.'") (quoting *Lee*, 476 U.S. at 541). *Lee* did not explicitly hold that such statements were not within a "firmly rooted hearsay exception," but it implied as much by noting that inculpatory statements by unavailable accomplices had been excluded in *Bruton* and *Douglas v. Alabama*, 380 U.S. 415 (1965), and by proceeding to examine the statements for "particularized guarantees of trustworthiness."

> In *Roberts*, we recognized that *even if certain hearsay evidence does not fall within "a firmly rooted hearsay exception" and is thus presumptively unreliable* and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a "showing of particularized guarantees of trustworthiness." *Ibid* [448 U.S. at 66]. . . . Illinois' asserted grounds for holding Thomas' statement to be reliable with respect to Lee's culpability simply do not meet this standard.

*Lee*, 476 U.S. at 543-44 (emphasis added). As the court in *Lilly* noted, it would have been unnecessary for the court in *Lee* to seek such "particularized guarantees of trustworthiness" if the statements fell within a "firmly rooted hearsay exception."

> Our holdings in *Bruton*[,] . . . *Cruz v. New York*, 481 U.S. 186 (1987), *Gray v. Maryland*, . . . and *Lee v. Illinois* . . . were all premised, explicitly or implicitly, on the principle that accomplice confessions that inculpate a criminal defendant are not *per se* admissible (and thus necessarily fall outside a firmly rooted hearsay exception), no matter how much those statements also incriminate the accomplice.

---

[5]There is no reason to think that the Constitution demands equivalence in these tests. Defendants may very well have a Due Process right to introduce hearsay evidence in their defense that is *less reliable* than the evidence that prosecutors may introduce in their case in chief without violating the Confrontation Clause. Put differently, the Constitution may afford defendants greater protection from inculpatory hearsay evidence (under the Confrontation Clause) than it provides to the state by limiting the exculpatory hearsay evidence that defendants have a Due Process right to present in their defense.

527 U.S. at 134 n.5. The court in *Lilly* thus cast the holding most relevant to Fulcher's case as follows: "The decisive fact, *which we make explicit today*, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." 527 U.S. at 134 (emphasis added).

We held in *Hill v. Hofbauer*, 337 F.3d at 717, that *Lilly* did not announce a "new rule" of criminal procedure, and thus could apply to cases on collateral review without regard to § 2254(d)(1). *See Teague v. Lane*, 489 U.S. 288, 301 (1989) (holding that in habeas cases, a subsequently decided case does not present new law if it is "dictated by precedent existing at the time the defendant's conviction became final"). In other words, we held that what was clearly established by *Lilly* was, in fact, clearly established *before Lilly*: "*Douglas, Bruton*, and *Lee* evidence that the Supreme Court had clearly established the principle that a co-defendant's custodial confessions are unreliable and not within a 'firmly rooted' hearsay exception prior to *Lilly*." *Hill*, 337 F.3d at 717. Because *Douglas* (1965), *Bruton* (1968), and *Lee* (1986) all pre-date the 1996 conclusion of Fulcher's direct appeal, the principle was clearly established by that point as well.

Kentucky disagrees, arguing on the basis of *Neuman v. Rivers*, 125 F.3d 315 (6th Cir. 1997), and *Gilliam v. Mitchell*, 179 F.3d 990 (6th Cir. 1999) (applying *Neuman* retroactively to 1994 conduct), that by the end of Fulcher's direct appeal it was clearly established that Ash's statement *did* fall into a firmly rooted hearsay exception—specifically, the hearsay exception in FED. R. EVID. 804(b)(3) for statements against penal interest. But in *Hill* we distinguished both of these cases. We said that unlike the contested statements in *Hill*, which inculpated the defendant (as Ash's do here), "the admitted statement [in *Neuman*] did not inculpate the declarant's accomplice, but only spoke to the declarant's role in the crime." 337 F.3d at 717 n.5; *see United States v. Franklin*, 415 F.3d 537, 547 (6th Cir. 2005) (rejecting the government's argument that the statement against penal interest exception was firmly rooted in the Sixth Circuit because "in *Neuman*—the one case where this Court suggested as much—the statements at issue were made by the defendant and inculpated only himself"). And we noted that "[in *Gilliam*,] we gave only a cursory review of the 'firmly rooted' exception issue, and rested our holding alternatively on two other grounds [*i.e.*, the presence of "particularlized guarantees of trustworthiness" and harmless error]." *Hill*, 337 F.3d at 717 n.5; *see Gilliam*, 179 F.3d at 994 n.1 (expressly avoiding *Neuman*'s holding because the Supreme Court had recently heard oral arguments in *Lilly*). Thus neither *Neuman* nor *Gilliam* stand in the way of *Hill*'s holding that after *Lee* (1986) (the latest case we considered necessary to *Lilly*'s holding), it was clearly established that there was no firmly rooted hearsay exception for "accomplices' confessions that inculpate a criminal defendant." *Lilly*, 527 U.S. at 134.

Nor does it matter that *Hill* concerned statements by a declarant who was later tried for the crime to which he confessed, either as a codefendant in a consolidated trial (as in *Hill*), or as a sole defendant in a separate trial (as in *Lilly*). A prosecutor's later decision to try a declarant does not affect whether the declarant's statements possessed sufficient "indicia of reliability" at the time they were made. The test of whether such indicia exist references only the substance and circumstances of the hearsay statement's declaration:

> [The] standard [for determining whether a hearsay exception is firmly rooted] is designed to allow the introduction of statements falling within a category of hearsay whose conditions have proven over time "*to remove all temptation to falsehood*, and to enforce as strict an adherence to the truth as would the obligation of an oath" and cross-examination at a trial.

*Lilly*, 527 U.S. at 126 (quoting *Mattox*, 156 U.S. at 244) (emphasis added). The logic of *Lilly*'s holding is simply that because "an accomplice's statements that shift or spread the blame to a

criminal defendant" may evidence such a temptation for falsehood, they cannot fall within a firmly rooted hearsay exception.  *Lilly*, 527 U.S. at 133 (quoted in *Hill*, 337 F.3d at 713-14).

Having considered the clearly established law with respect to *Roberts*'s "firmly rooted" category, we now address the clearly established law at the time of Fulcher's direct appeal regarding certain features of the "particularized guarantees of trustworthiness" inquiry.  First, as noted above, *Wright* prohibited courts from considering corroborating evidence when seeking such "guarantees."  Second, *Lee* guided courts to question the reliability of confessions elicited by custodial police interrogation, given the incentives that declarants in such circumstances face:

> Although . . . the confession was . . . voluntary for Fifth Amendment purposes, such a finding does not bear on the question of whether the confession was also free from any desire, motive, or impulse Thomas may have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate Lee's involvement in retaliation for her having implicated him in the murders.

*Lee*, 476 U.S. at 544.  Because of the presence of such incentives, the court in *Lee* held that the custodial statements in that case were not supported by "particularized guarantees of trustworthiness."  Moreover, as *Lilly* would later note,

> [T]he historical underpinnings of the Confrontation Clause and the sweep of our prior confrontation cases offer one cogent reminder: It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice -- that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

527 U.S. at 137.  Similarly, *Williamson v. United States*, 512 U.S. 594 (1994) (interpreting Federal Rule of Evidence 804(b)(3) to not allow the admission of an accomplice's statement against his penal interest that inculpated the defendant), suggested (in dicta) that the motivation of a declarant to limit her own liability was relevant to the constitutional inquiry.  Although it acknowledged that "the very fact that a statement is *genuinely* self-inculpatory is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause," *id.* at 605 (emphasis added), it noted that whether a statement was in fact self-inculpatory could be hard to discern, since "[a] reasonable person . . . might even think that implicating someone else would decrease his practical exposure to criminal liability, at least so far as sentencing goes."  *Id.* at 604.

To summarize, at the time the Kentucky Supreme Court affirmed Fulcher's conviction (1996), *Roberts* (1980) had identified the two ways that hearsay statements by an unavailable declarant could be admitted without violating the Confrontation Clause:  either via a "firmly rooted hearsay exception," or with "particularized guarantees of trustworthiness."  Though it was not made explicit until *Lilly* (1999), *Lee* (1986) had implied that there was no firmly rooted exception for "accomplices' confessions that inculpate a criminal defendant." *Lilly*, 527 U.S. at 134.  In particular, *Lee* held that such statements were "presumptively unreliable" and required an examination of the facts for indicia of reliability.  In that examination, according to *Wright* (1990), the evidence had to "possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."   497 U.S. at 822.  And as for what a court *should* look to as an indication of reliability, in the case of a police interrogation, it included evidence that might rebut the "reasonable" possibility that the declarant thought that "implicating someone else would decrease his practical exposure to criminal liability, at least as far as sentencing goes." *Williamson*, 512 U.S. at 604.  Finally, it was clearly established that *Chambers* (1973) pertained to a defendant's right

under the Due Process Clause to offer exculpatory hearsay, rather than the state's right to offer inculpatory hearsay without violating the Confrontation Clause.

*The Kentucky Supreme Court's Decisional Rule*.  Fulcher's brief to the Kentucky Supreme Court challenged the admission of Ash's statements as violating Fulcher's Confrontation Clause rights, but it did so by contending that the trial court misapplied the four-factor test from *Taylor* and *Chambers*.[6]  The Kentucky Supreme Court in turn rejected Fulcher's Confrontation Clause challenge solely by concluding that the trial court applied the *Taylor* test correctly.  The court cited neither *Roberts*, nor *Lee*, nor *Wright*.  (J.A. 98-101.)

On the first factor of the *Taylor* test, "the time of the declaration and the party to whom made," the court found that "the time of the declaration and the party to whom it was made are indeed indicative of the statements' trustworthiness, particularly in light of the fact that Ash spoke with police shortly after the crimes at issue had occurred." (J.A. 100.)  On the second, "the existence of corroborating evidence in the case," the court found two pieces of corroborating evidence:  the key, which the police found in the location that Ash had suggested (combined with Wright's testimony that Fulcher was present when disposing of the key was discussed); and "evidence found at the crime scene"—presumably blood—that was "consistent with Ash's statement that [Fulcher] had blood on his clothes." (J.A. 100-01.)  Regarding the third, "the extent to which the declaration is against the declarant's penal interest," the court found that Ash's declaration was against her penal interest because Ash was in a custodial setting, advised of her rights, made aware that the police were investigating Fulcher's involvement in the murder, and not assured that she herself was not a suspect until after she made her statements.  Moreover, the court found, Ash believed that her statements would expose her to criminal liability—for destroying evidence and disposing of the fruits of a crime—because she thought that Fulcher had been *in a fight* when she washed his sweatpants, and because she believed the true owner was seeking the key that she had discarded. (J.A. 101.)  The fourth factor of the *Taylor* test,  "the availability of a declarant as a witness," was undisputed.  (*Id.*)

*Inconsistency Between the Kentucky Rule and Clearly Established Federal Law*.  The state correctly notes that the Kentucky court's failure to cite *Roberts*, *Lee*, or *Wright* in its opinion is irrelevant to whether its decision was contrary to federal law, provided that "neither the reasoning nor the result . . . contradicts [those cases]." *Early v. Packer*, 537 U.S. 3, 8 (2002).  However, as Fulcher notes, *Taylor*'s four-factor test, and the Kentucky Supreme Court's application of it, were contrary to the reasoning and the result that federal law required in at least two ways.

First, the four-factor test required that statements against penal interest be corroborated by the very sort of extrinsic evidence that *Wright* forbade courts to consider when seeking the "particularized guarantees of trustworthiness" necessary to support hearsay that did not fall within a firmly rooted hearsay exception.  *Wright* instructed courts to identify indicia of *inherent* reliability—without regard to "other evidence at trial"—before admitting hearsay statements by unavailable declarants.  497 U.S. at 822.  The Kentucky court directly contravened this rule with its references to the key, Wright's testimony, and the evidence found at the crime scene.  The *Taylor* test contradicted federal law because it was impossible to satisfy the demands of both.

Second, *Taylor*'s four-factor test allowed the admission of statements based upon a finding of trustworthiness that was inconsistent with the "particularized guarantees" required by the Supreme Court.  In *Lee*, *Williamson* (a non-constitutional case), and *Lilly*, the court noted that the incentive that a person in police custody faces to implicate another—on the belief that doing so will limit his or her own liability—undermines the credibility of their statements.  Yet in the Kentucky

---

[6]*See supra*, note 2.

court's view, the fact that Ash gave her statement to the police *militated in favor* of its admissibility. Similarly, one point of debate in the Kentucky courts was whether Ash was sufficiently aware of her legal jeopardy to make a statement against her penal interest. (J.A. 99.) The state argued that she was, and the Kentucky courts agreed, notwithstanding the fact that the same conclusion made it more likely that she would fabricate facts to *limit* her perceived liability. Once again, the *Taylor* rule and the constitutional standard pulled in opposite directions.

Because Ash's statements clearly did not fall within a firmly rooted hearsay exception, and because the Supreme Court forbade courts to seek "particularized guarantees of trustworthiness" in the manner that *Taylor*'s four-part test *required*, we hold that the four-part test was "a rule that contradict[ed] the governing law." *Williams*, 529 U.S. at 405. De novo review, according to the law at the time, is accordingly appropriate.

### 3. Applying De Novo Review, Ash's Statements Were Inadmissible

Much of the above discussion is relevant to a de novo review of whether Ash's statements were admissible under federal law in 1996. *Roberts* commands that we seek "indicia of reliability" before admitting the statements, and upon finding that statements such as Ash's did not fall within a firmly rooted hearsay exception, the inquiry becomes whether "particularized guarantees of trustworthiness" support their admission (subject, of course, to the constraints of *Wright* and *Lee*).

The above discussion establishes that accomplice confessions that inculpate criminal defendants did not fit into a firmly rooted hearsay exception in 1996. Besides directing our attention to *Neuman* and *Gilliam*, Kentucky does not argue otherwise. In contrast, Fulcher identifies certain hearsay exceptions that *were* firmly rooted at the time, because they were "at least two centuries old . . . [and recognized by] nearly four-fifths of the states," *White v. Illinois*, 502 U.S. 346, 356 n.8 (1992) (finding firmly rooted the exception for spontaneous declarations), or because they were recognized by the Supreme Court for over 150 years and "steeped in [Supreme Court] jurisprudence," *Bourjaily v. United States*, 483 U.S. 171, 183 (1987) (finding firmly rooted the exception for statements by co-conspirators "in the course and in furtherance of the conspiracy"). Kentucky does not contend that the exception for accomplices' confessions that inculpate criminal defendants has a similar pedigree.

We next ask whether particularized guarantees of trustworthiness, "inherent" to Ash's statements, supported their admission. *Wright*, 497 U.S. at 822. And for this we consider the substance of the statements as well as the circumstances under which Ash made them. At the trial stage, the state had the burden of proving that the statements were supported by particularized guarantees of trustworthiness. *See United States v. Gomez-Lemos*, 939 F.2d 326, 332 (6th Cir. 1991) ("[T]he prosecution must defeat a presumption against the admissibility . . . by showing that their testimony possessed 'particularized guarantees of trustworthiness.'") (quoting *Roberts*, 448 U.S. at 66). But "[a]t the federal stage, the habeas petitioner, not the State, has the burden of proving that the state courts were in error, not the other way around." *Hill*, 337 F.3d at 712. Fulcher must thus prove that, on account of the substance and circumstances of Ash's confession, her statements lacked the particularized guarantees of trustworthiness required by *Roberts*.

Fulcher contends first that Ash's statements were unreliable because she "was viewed as an accomplice by the police." (Appellant's Br. 35.) As the Kentucky Supreme Court noted, "she was advised of her rights, . . . made aware that police were investigating [Fulcher's] involvement in a murder . . . [and assured by the police] that she was not a suspect in the case only *after* she had

provided police with her statement." (J.A. 101.[7]) Fulcher concludes that "the confession exhibited insufficient guarantees of reliability" because, given Ash's fear of liability, "it may have been in [her] best interests to tell the authorities what they wanted to hear." (Appellant's Br. 35 (citing *Lee*, 476 U.S. at 544-45).)

Kentucky responds that Ash's statements were sufficiently reliable to satisfy the rule in *Roberts* because Ash was not an accomplice to Fulcher's crimes, but was guilty only of tampering with the evidence. Thus, Kentucky argues, "Ash's statements were not made in a situation where she was attempting to shift or spread blame from herself to a confederate." (Appellee's Br. 26.) But the particular crime that Ash *might have been* charged with is beside the point. The threat—at the time she made her statements—that the police would charge her in the future gave her the incentive to finger Fulcher and *to claim* a limited role for herself. It would be anachronistic to conclude, on the basis of her claimed limited involvement, that her statements were sufficiently reliable to be admitted against Fulcher.

It is nonetheless useful to ask whether Ash's statements were of a sort that shifted or spread blame or mitigated her own culpability because, considering how *Hill* distinguished *Neuman*,[8] there was a class of custodial hearsay statements that were admissible against a defendant, but not so directly implicating of the defendant to be of questionable reliability. Neither of Ash's statements falls within that class. Her first statement, that she washed Fulcher's sweatpants after he told her that he was in a fight, directly implicated him and limited her own liability by disavowing any knowledge of the murder. And her second statement, that Wright told her to throw away the key, similarly cast Wright in a guilty light, while limiting her own role. Both of these statements differ from the one at issue in *Neuman*, where the court admitted an out-of-court statement that inculpated only the declarant. In contrast, both of Ash's statements implicated others.

Fulcher contends next that Ash's statements lacked sufficient guarantees of trustworthiness because the statements were made in police custody. The substance of this argument essentially mirrors his previous one, for what renders a statement elicited by police interrogation unreliable is the fact that the circumstances offer the person in custody an opportunity to shift scrutiny away from himself or herself by implicating another. *Cf. Franklin*, 415 F.3d at 547-48 (allowing the admission of an accomplice's confession because it was made "not to investigators but to his close friend . . . [who] he had no reason to conclude would reveal those statements to law enforcement").

Third, Fulcher questions the reliability of Ash's statements because they were "made in response to the police interrogator's leading questions." (Appellant's Br. 37.) In *Lee*, the Supreme Court found a statement against penal interest unreliable in part because it was an "unsworn statement . . . given in response to the questions of police, who . . . knew what they were looking for, and . . . was not tested in any manner by contemporaneous cross-examination." 476 U.S. at 544. Here, while the police officer's questions do not appear to be particularly "leading," they are more leading than would typically be allowed in an adversarial proceeding.[9] And as *Wright* noted,

---

[7]Remember that in the Kentucky courts, the state argued that Ash's statements were so *clearly* against her penal interest as to demonstrate their reliability. Because the constitutional test pushes in the opposite direction from the state's, Fulcher is able to co-opt the Kentucky court's adverse judgment below.

[8]*See supra*.

[9]Consider the following exchanges between Ash and Detective Jones. Regarding Fulcher and Wright's relationship:

Det. Jones: [S]o you was to say [sic] that Elem and Terry are pretty good friends among each other . . . would that be a fair statement to say?

statements allowed in under the "particularized guarantees" exception had to be "so trustworthy that adversarial testing would add little to their reliability." *Wright*, 497 U.S. at 821.

Finally, Fulcher cites two cases, *United States v. Gomez-Lemos*, 939 F.2d 326 (6th Cir. 1991), and *Calvert v. Wilson*, 288 F.3d 823 (6th Cir. 2002), in which the Sixth Circuit held certain accomplice confessions inadmissible for violating the Confrontation Clause. In *Gomez-Lemos*, this court noted that "'once partners in a crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists rather than accomplices.'" 939 F.2d at 330 (quoting *Lee*, 476 U.S. at 544-45). And in *Calvert*, a case that parallels *Hill*, this court found insufficient guarantees of trustworthiness because, "[l]ike the accomplice in *Lee*, [the declarant] made his statements under the supervision of governmental authorities, in response to police officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties." 288 F.3d at 832.

Considering the circumstances of Ash's statements (police custody and interrogation, leading questions, and the police officers' suspicion of her wrongdoing) together with the substance of those statements (inculpating Fulcher and limiting her involvement with the crimes), we find that Ash's statements lacked "particularized guarantees of trustworthiness." In light of our conclusion that the statements did not fall under a firmly rooted hearsay exception, we hold that it was error to admit them.

### 4. The Kentucky Supreme Court's Error Was Not Harmless

"[C]onstitutional error is cause for federal habeas relief only if it has 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Hill*, 337 F.3d at 718 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

> In determining whether Confrontation Clause error is harmless . . . , the reviewing court should consider: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case."

*Hill*, 337 F.3d at 718 (quoting *Delaware v. van Arsdall*, 475 U.S. 673, 684 (1986)) (second alteration in original). And in contrast to what may be used to determine whether an error occurred, a court may consider corroborating evidence to determine whether the error was harmless. *Wright*, 497 U.S. at 823. Neither side has the "burden" of proving that the error was harmless (or not), but when "the record is so evenly balanced" that "a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*,

---

> Ash: I'd say it was a fair statement, I mean . . . I guess so . . . I mean I wouldn't consider him one of Ray's best friends, if that's what you mean, no.
> Det. Jones: But they pretty much hang out, hang around together?
> Ash: Sometimes . . . when Terry decides he wants to come around for awhile.

(J.A. 150.) And regarding when Fulcher asked her to wash his pants:

> Det. Jones: Okay, do you remember what day that this was?
> Ash: No I don't . . . can't really. I, I know it was before the holidays, but I don't remember the date.
> Det. Jones: Right before Christmas?
> Ash: Around Christmas . . .

(J.A. 143.)

513 U.S. 432, 436-37 (1995); *cf. Murillo*, 402 F.3d at 793 (finding that the brevity of the State's argument for harmlessness "makes it impossible [for the court] to say that the [erroneously admitted] statement . . . was unlikely to have had a substantial and injurious effect on the verdict").

Fulcher notes that the prosecution's case was "entirely circumstantial" and that no physical evidence linked Fulcher to the crime scene or the crime:  no fingerprints, no clothing stained with the victim's blood, no traces of the victim's blood in Fulcher's car, and no murder weapon. Kentucky responds by arguing that the error was harmless for several reasons:

> [1] [A]n eye witness/accomplice, Terry Wright, testified about Fulcher's conduct which he personally observed, in killing the victim and leaving the victim's premises with blood on Fulcher's clothing; [2] two other witnesses testified that Fulcher made statements to them amounting to an admission that he had killed the victim; [3] a third person testified that Fulcher had offered him a bribe in order to provide an alibi; and [4] Fulcher made incriminating statements to two police officers.

(Appellee's Br. 16.)  We consider each of Kentucky's pieces of evidence in turn.

First, given our discussion above about reliability, we view Wright's testimony with some skepticism.  As Fulcher notes, Wright was an alleged accomplice and an admitted drug user and dealer; "he admitted to being at the victim's house when money was stolen on a number of previous occasions;" "[h]e had the victim's blood on his clothing;" and "he was the only person seen at the victim's house at the time."  (Appellant's Br. 43.)  He thus had a substantial interest in shifting blame to Fulcher.  Although we do not question that it was the jury's responsibility to assess Wright's credibility (including how well his testimony held up on cross-examination), we must consider the likelihood that Ash's statements *bolstered* Wright's account in the jury's eyes.  Without Ash's account of washing the blood off of Fulcher's sweatpants, *nothing* would have physically connected Fulcher to the crime.  Wright, about whom there existed ample physical evidence, would have provided the only link.[10]

Next, Kentucky cites the testimony of two persons to whom Fulcher allegedly admitted committing the crime.  Fulcher notes that both were "jailhouse snitches," whose testimony should be given little weight.  *See Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004); *United States v. Bernal Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (questioning the reliability of criminal informant testimony).  Kentucky offers no response.

Kentucky's third item of evidence supporting a finding of harmlessness, Fulcher's effort to bribe someone to offer an alibi, shows only that Fulcher hoped (by illicit means) to avoid liability. Yet this same thinking motivates all defendants who hire lawyers.  Fulcher's attempted bribery demonstrates that given Wright's testimony and the possible admission of Ash's statements, he (quite understandably) feared conviction.  The bribe adds no independent evidence connecting Fulcher to the crime.

Kentucky's final item of evidence, Fulcher's incriminating statements to police officers, is insufficiently developed to deserve further consideration.  The state offers no specificity as to what such statements declared.

---

[10]*Cf. Stapleton v. Wolfe*, 288 F.3d 863, 867-68 (6th Cir. 2002).  In *Stapleton*, there were three accomplices in a string of burglaries: Stapleton, Studer, and Foreman.  Studer made several out-of-court statements inculpating Stapleton.  In addition, Foreman testified at trial that Stapleton had played a substantial role.  The trial court allowed Studer's statements to be admitted, which the Sixth Circuit held to violate Stapleton's confrontation right.  The panel further found that the error was not harmless, *notwithstanding Foreman's testimony at trial*.  The court rejected the state's arguments that Studer's statements were (a) unimportant, given Foreman's testimony; (b) cumulative, in light of Foreman's testimony; and (c) reliable, because they were corroborated by Foreman's testimony.

Kentucky also cites to the five-factor test of harmlessness in *Stapleton v. Wolfe*, 288 F.3d 863, 867-68 (6th Cir. 2002), which instructs courts to consider:

> (1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case.

(citations and quotation marks omitted). Kentucky does not explain how those factors would apply to this case, but Fulcher argues that they weigh *against* a finding of harmlessness. First, Fulcher contends the importance of Ash's statements was demonstrated by the jury asking to rehear the tape of Ash's statements and rendering its verdict half an hour later. (Kentucky chalks this up to perhaps their difficulty in understanding the audio, though at oral argument the state could offer no foundation for this suggestion.) Second, Fulcher contends that Ash's statements were not cumulative because no other evidence went to Fulcher's alleged effort to destroy evidence or connected the parties to the discarded key. Third, Fulcher notes that there was some inconsistency between Ash's statement and Wright's testimony: Wright testified that Fulcher was wearing either jeans or a favorite "Dolphins' suit" on the night of the murder, whereas Ash claimed to have washed grey sweatpants. Fourth, Ash was never cross-examined. And fifth, Fulcher noted that even after Ash, all of the remaining witnesses had a motive to lie.

Viewing the totality of the evidence, we cannot reject the possibility that the admission of Ash's statements had "a substantial and injurious effect or influence in determining the jury's verdict," and we have "grave doubt" that they did not. *Brecht*, 507 U.S. at 623 (citation and quote omitted). Ash's statements bolstered the only direct account of Fulcher's involvement in the crime and connected to him the only physical (albeit circumstantial) evidence in the government's case. Moreover, the most logical reason as to why the jury asked to rehear the tape of Ash's interview was that they did not consider Wright's direct testimony alone to be sufficient for a guilty verdict. Finally, the Kentucky Supreme Court (applying the wrong standard) believed that the admissibility of Ash's statements was a "close call." (J.A. 102.) Kentucky may well have taken the risk that the verdict would be reversed for submitting Ash's statements because it "expected [the statements] to have punch and doubted the sufficiency of other evidence." *Murillo*, 402 F.3d at 793. For these reasons, we are unable to hold harmless the erroneous admission of Ash's statements.

## C. *Crawford* Retroactivity

Fulcher contends that *Crawford v. Washington*, 541 U.S. 36 (2004), announced a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding," *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997) (citations omitted), and thus warrants retroactive application to Fulcher's case. *Cf. Teague v. Lane*, 489 U.S. 288 (1989). A panel of the Sixth Circuit rejected this conclusion in *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005), but without substantial analysis.[11] Given our decision to order that the writ be granted on the basis of pre-*Crawford* law, we find it unnecessary to address whether *Crawford* announced a "watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding,"

---

[11]To this point, four other circuits have addressed whether *Crawford* applies retroactively to cases on collateral review. Three have held that it does not apply retroactively. *See Murillo v. Frank*, 402 F.3d 786, 790 (7th Cir. 2005) (April 1, 2005); *Bintz v. Bertrand*, 403 F.3d 859, 867 (7th Cir. 2005) (April 7, 2005); *Brown v. Uphoff*, 381 F.3d 1219, 1227 (10th Cir. 2004); *Mungo v. Duncan*, 393 F.3d 327, 336 (2d Cir. 2004). One has held that it does. *See Bockting v. Bayer*, 399 F.3d 1010, 1021 (9th Cir. 2005), amended in part by *Bockting v. Bayer*, No. 02-15866, 2005 U.S. App. LEXIS 9976 (9th Cir. June 1, 2005). In that one case a petition for a writ of certiorari was filed on November 7, 2005 and currently pends. *See* 2005 WL 3038541.

or Judge Clay's concern that the analysis in *Dorchy* was insufficiently thorough to bind later panels of this court.

### III. Conclusion

We hold that the admission of Ash's statements violated Fulcher's rights under the Confrontation Clause of the Sixth Amendment. Because we are unable to conclude that such error was harmless, we **REVERSE** the district court's judgment and **REMAND** for entry of the writ.

———————————————

## CONCURRENCE

———————————————

CLAY, Circuit Judge, concurring.  I write separately because I believe that *Crawford v. Washington*, 541 U.S. 36 (2004), establishes a watershed rule in criminal procedure requiring retroactive application under the Supreme Court's retroactivity analysis in *Teague v. Lane*, 489 U.S. 288 (1990).  *Crawford*'s retroactive application therefore makes *Crawford* the "clearly established" federal law at the time of direct review.  When *Crawford* is applied to the facts of this case, Petitioner's Sixth Amendment rights under the Confrontation Clause were violated when his wife's taped statement was admitted into evidence.  Because this error was not harmless, a writ of habeas corpus should be granted.

## I.

## BACKGROUND

On December 22, 1991, the beaten and stabbed body of Charlie Bramer was discovered in his home in Jefferson County, Kentucky.  After an investigation, Petitioner was charged with and convicted of the crime.

At Petitioner's jury trial, the State of Kentucky relied largely on testimonial evidence for Petitioner's conviction.  The State put inmates on the witness stand who testified that Petitioner had told them, in jailhouse conversations, that he had committed the murder.  The State also put Terry Wright on the stand.  Wright had confessed to helping Petitioner commit the murder, alleging that Wright and Petitioner went to the victim's home in order to rob the victim, but that the victim discovered Wright and Petitioner during the course of the robbery and chased them out of the house.  Wright further testified that Wright and Petitioner later returned to the victim's home and Wright waited outside while Petitioner entered the home.  When Wright entered the home several minutes later, Wright alleges that he found Petitioner attacking the victim with a hammer.  Wright testified that he made an unsuccessful attempt to stop Petitioner.

The state also called Patricia Ash Fulcher ("Ash") to testify against Petitioner.  Ash had given the police a statement shortly after the investigation into the crime began, but had since married Petitioner, asserted spousal privilege under Kentucky Rule of Evidence 107(b), and refused to testify against Petitioner.  The state played Ash's tape-recorded statement to the police for the jury, albeit over the objections of Petitioner's counsel.  The trial court ruled that the statement was admissible as an exception to the hearsay rule as a statement against penal interest because the contents of Ash's statements inculpated both Petitioner and Ash herself.

Ash's statement had been made while in the custody of the Jefferson County police.  Ash was stopped on January 2, 1992 while driving a car that matched the description of Petitioner's automobile.  The police impounded the car and took Ash in for questioning.  The police read Ash her *Miranda* rights and proceeded to question her.

During the course of questioning, Ash revealed that over the course of the December 1991 holidays, Petitioner had arrived home late one evening and asked Ash to wash the clothes Petitioner had been wearing.  Ash indicated that there were some spots of blood on the pants, and that Petitioner explained the blood by saying that he had been in a fight.  Ash also stated that Terry Wright, also present at the time, asked Ash to dispose of a key.  Ash admitted that she threw the key into the sewers, where police subsequently recovered it and confirmed that the key belonged to the victim.

Police found no evidence at the victim's house to link Petitioner to the crime scene. A murder weapon was never recovered.

During jury deliberations, the jury requested both Ash's tape recorded statement and a tape recorder. Within an hour of hearing the tape, the jury returned with a conviction. After unsuccessful direct appeals and collateral attacks in state court, Petitioner now requests habeas relief on the basis of this improperly admitted evidence.

## II.

### *CRAWFORD* ANALYSIS

This Court reviews the decision of the district court to deny a writ of habeas corpus *de novo*. *Allen v. Yukins*, 366 F.3d 396, 399 (6th Cir. 2004) (citing *Gonzales v. Elo*, 233 F.3d 348, 352 (6th Cir. 2000)).

### A.     *Crawford*'s Retroactivity Is an Issue of First Impression in This Circuit

The lead opinion opines that this Court has already ruled that *Crawford* does not apply retroactively. It is true that panels of this Court are bound by the published decisions of prior panels as controlling precedent. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). The *Dorchy v. Jones* case cited in the lead opinion, however, does not actually treat *Crawford*'s retroactivity sufficiently to bind subsequent panels of this Court. This Court's entire treatment of *Crawford* in that case consists of the following:

> Under most circumstances, however, newly promulgated rules of criminal procedure do not apply retroactively to cases on collateral review. *Teague v. Lane*, 489 U.S. 288, 305-11 . . . (1989) (holding that a habeas petitioner could not benefit from a recent Supreme Court decision declaring racially-based peremptory challenges invalid, because that decision could not be applied retroactively to cases on collateral review) . . . . *Teague* thus prohibits [petitioner] from availing himself of the new rule articulated in *Crawford*. The question before us is therefore whether the analysis by the [state court] was contrary to, or involved an unreasonable application of, *Roberts*.

*Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005). The *Dorchy* panel did not subject *Crawford* to the *Teague* retroactivity analysis.[1] These two sentences are dicta and do not go to the holding of the case. In fact, the *Dorchy* panel affirmed the district court's grant of a writ because the Court found the state court's ruling to have been an "unreasonable application of" clearly established confrontation clause jurisprudence under *Roberts* at the time of the state court decision. *See id.* at 791. Subsequent panels of this Court are not bound by prior panels on issues not actually reached by those prior panels. *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 298 (2005).

### B.     The *Crawford* Holding

The Supreme Court's 2004 decision in *Crawford v. Washington* overruled the *Roberts* indicia of reliability test for mutually inculpatory statements. *See* 541 U.S. at 68. In *Crawford*, the state sought to admit a statement made by the criminal defendant's wife shortly after the crime in question occurred. *Id.* at 40. The statement was made to the police while the wife was in a custodial setting

---

[1] In fact, this is just the sort of "drive-by" "holding" that Justice Scalia has decried as meriting no precedential value, although sometimes understandable in light of the particular facts before the issuing panel. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (stating that a prior court's summary assumption of jurisdiction without analytical support held no precedential effect and indicating that such treatments are dicta).

and tended to inculpate the wife, insofar as it showed that she facilitated her husband's commission of the crime. *See id.* In the state of Washington, spousal privilege does not extend to out-of-court statements admissible under an exception to the hearsay rule. *Id.* The trial court admitted the statement under the "against penal interest" exception to the hearsay rule. *Id.*

The Supreme Court of Washington upheld the conviction and the propriety of the statement's admission under the *Roberts* indicia of reliability test. *Id.* at 41-42. On direct review, the United States Supreme Court reversed, finding that *Roberts* had proven too nebulous a standard for the lower courts to employ in insuring that rights under the Confrontation Clause were properly guaranteed. *Id.* at 68-69. The Court concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional concerns is the one the Constitution actually prescribes: confrontation." *Id.* at 69.

In reaching its conclusion, the Supreme Court expanded on the principles underlying the Confrontation Clause:

> First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. It was these practices that . . . English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind.

> Accordingly, we once again reject the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon "the law of Evidence for the time being." 3 Wigmore § 1397, at 101; *accord*, *Dutton v. Evans*, 400 U.S. 74, 94 (1970) (Harlan, J., concurring in result). Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices . . . .

> This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

> . . . .

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. *Cf.* 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses . . . is much more conducive to the clearing up of truth") . . . .

. . . .

> Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Crawford*, 541 U.S. at 36, 51, 61-62, 68.

Respondent does not dispute that had *Crawford* come out prior to the final disposition of Petitioner's case on direct review, the Court's holding would have applied to Petitioner's case.

## C.      Watershed Rules in Criminal Procedure

As a general rule, new rules of criminal procedure do not have retroactive effect and are unavailable for use in a collateral attack to a criminal conviction. *See Teague*, 489 U.S. at 316. The Supreme Court has set forth an exception to this general rule, however: when the new rule represents a "watershed rule" of criminal procedure. *Id.* The only example of such a watershed rule ever cited by a majority of the Court since issuing the *Teague* decision is the right to counsel, as set forth in *Gideon v. Wainwright*, 372 U.S. 335 (1963).

The Court has explained that a "watershed rule" is a rule which goes to the "fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495 (1990). The procedure at issue would be "central to an accurate determination of innocence or guilt . . . ." *Teague*, 489 U.S. at 313. "That the new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is *seriously diminished*.'" *Schriro v. Summerlin*, 542 U.S. 348, 125 S.Ct. 2519, 2523 (2004) (quoting *Teague*, 489 U.S. at 313) (emphasis in original). "A rule that qualified under this [watershed rule] exception must not only improve accuracy, but also 'alter our understanding of the bedrock procedural elements' essential to the fairness of a proceeding." *Sawyer v. Smith*, 497 U.S. 227, 242 (1990) (quoting *Teague*, 489 U.S. at 311).

To date, the Supreme Court has yet to announce a "watershed rule" of criminal procedure since *Teague*. Indeed, the *Teague* decision noted that the Court doubted whether there were many fundamental tenets of due process that were yet to be discovered. 489 U.S. at 313. The *Teague* Court itself found that the fair cross section requirement for jury venire did not merit retroactive application. *Id.* at 314.

Since *Teague*, the Supreme Court has consistently refused to apply new rules in capital sentencing in a retroactive fashion. The *Sawyer* Court dealt with a new rule requiring a sentencing reversal when a prosecutor's remarks to the jury tended to diminish the jury's responsibility in recommending a death sentence. *See Sawyer*, 497 U.S. at 244-45. The Court reasoned that because the new rule was a prophylactic one which benefitted criminal defendants only insofar as those defendants could not make the requisite showing of fundamental unfairness under the previously applicable standard, the rule therefore was not an "'absolute prerequisite to fundamental fairness.'" *Id.* (quoting *Teague*, 489 U.S. at 314.) Similarly, in *Graham v. Collins* the Court reasoned that the denial of special jury instructions on mitigation factors during the capital sentencing phase did not "'seriously diminish[] the likelihood of obtaining an accurate determination' in [the defendant's] sentencing proceeding." 506 U.S. 461, 478 (1993) (quoting *Butler v. McKellar*, 494 U.S. 407, 416 (1990)); *see also O'Dell v. Netherland*, 521 U.S. 151, 167 (1997) (refusing to grant retroactive application of a new rule requiring trial courts to allow capital defendants to rebut prosecutions'

assertions of continued dangerousness as a factor in death sentence consideration, when defendants would be ineligible for parole under a life sentence); *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2515 (2004) (refusing to give retroactive effect to the Court's new rule that invalidated a state practice of requiring juries to disregard mitigating factors not found unanimously in capital sentencing cases).

The Court has continued to decline retroactivity in the context of capital sentencing determinations. In *Schriro*, the Court ruled that its newly announced rule requiring juries, and not judges, to find aggravating circumstances necessary for imposition of the death penalty was not a watershed rule. *Schriro*, 125 S.Ct. at 2525. The *Schriro* Court found the evidence "too equivocal" to support a determination that judicial factfinding so "seriously diminished" accuracy in the criminal proceeding that there was "an impermissibly large risk of punishing conduct the law does not reach." *Id.* (internal quotations and citations omitted). The ruling in *Schriro* has been understood to mean that the Court's *Apprendi* decision – requiring juries to make the factual determination for anything increasing a defendant's sentence beyond the statutory maximum – does not state a watershed rule in criminal procedure. *Blakely v. Washington*, 542 U.S. 296, 323 (2004) ("[W]e [held] in *Schriro v Summerlin* . . . that *Ring* (and *a fortiori Apprendi*) does not apply retroactively on habeas review . . . .").

Beyond the capital sentencing arena, the Court has found that a habeas petitioner's proposed rule – that one day's notice of the state's intention to call an opposing witness be found *per se* violative of due process – "has none of the primacy and centrality of [a watershed rule] which may be thought to be within the [*Teague*] exception." *Gray v. Netherland*, 518 U.S. 152, 170 (1996) (internal quotations and citations omitted). The Court has also found that a circuit court inappropriately applied a new rule in a retroactive manner when the appeals court granted a request for habeas corpus relief upon finding that a state practice of permitting the prosecution to resubmit evidence of prior convictions in subsequent resentencing hearings (after having failed to prove prior convictions at the original sentencing hearing) violated the Double Jeopardy Clause. *See Caspari v. Bohlen*, 510 U.S. 383, 396-97 (1994) (acting on habeas petition). The Court reasoned that "[a]pplying the Double Jeopardy Clause to successive noncapital sentencing is not such a ground breaking occurrence" as to warrant retroactive application. *Id.* at 396.

Prior to the retroactivity standard articulated in *Teague*, the Court balanced prudential concerns in determining whether a new rule should be granted retroactive effect. The Court consistently declined to grant retroactive effect to rules designed to deter police misconduct. *See Linkletter v. Walker*, 381 U.S. 618, 636-40 (1965) (the exclusionary rule to state conduct); *Johnson v. New Jersey*, 384 U.S. 719, 733-35 (1966) (*Miranda* requirements); *Solem v. Stumes*, 465 U.S. 638, 650 (1984) (the invalidity of any waiver of the right to right to counsel after the invocation of such right and before counsel can appear); *Tehan v. United States*, 382 U.S. 406, 416-19 (1966) (the right of the accused not to have the prosecutor comment on the accused's election to keep silent); *Stovall v. Denno*, 388 U.S. 293, 299 (1967) (the right to counsel during pre-trial identification procedures).

Consistent with its post-*Teague* decisions declining to give retroactive effect to decisions affecting the jury's role in fact-finding, the pre-*Teague* Court also declined to apply retroactively its determination that criminal defendants enjoy a right to a jury trial in state criminal prosecutions. *See Schriro*, 125 S.Ct. at 2525 (discussing the Court's refusal in *DeStefano v. Woods*, 392 U.S. 631 (1968), to apply *Duncan v. Louisiana*, 391 U.S. 145 (1968), retroactively). The Court reasoned that if a trial without a jury was not "impermissibly inaccurate" then a judge's determination of aggravating factors in death penalty deliberations could not require retroactive renunciation. *Id.* at 2526.

In contrast, prior to *Teague*, the Court granted retroactive effect to a number of new rules going to the central tenets of our criminal justice system. The Court granted retroactive effect to the

right to counsel as articulated in *Gideon v. Wainwright*. The Court also granted retroactive effect to the application of the Double Jeopardy Clause to the states. *See Robinson v. Neil*, 409 U.S. 505, 510 (1973). The Court additionally granted retroactive effect to a rule proscribing state laws which grant the prosecution unlimited challenges for cause against any prospective juror with any reservations about the death penalty in capital cases. *See Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).

Significantly, in two pre-*Teague* cases, the Court twice granted retroactive effect to new rules dealing with the Confrontation Clause. In *Roberts v. Russell*, 392 U.S. 293, 293 (1968) (*per curiam*), the Court held that its rule articulated in *Bruton v. United States*, 391 U.S. 123 (1968), merited retroactive application. The *Bruton* rule held that limiting jury instructions could not cure the harm caused in a joint trial by the introduction of a codefendant's extrajudicial confession. 391 U.S. at 135. The Court reasoned that the admission without the opportunity for cross-examination resulted in "'serious flaws in the fact-finding process at trial.'" *Roberts*, 392 U.S. at 294 (citing *Stovall*, 388 U.S. at 298). The Court held that the admission of the testimonial statement absent confrontation "went to the basis of the fair hearing and trial because the procedural apparatus never assured the [petitioner] a fair determination of his guilt or innocence." *Id.* (internal citations and quotations omitted). Similarly, in *Berger v. California*, 393 U.S. 314, 314-15 (1969) (*per curiam*), the Court retroactively applied the rule announced in *Barber v. Page*, 390 U.S. 719 (1968). The *Barber* Court held that states may not use at trial the prehearing testimony of a witness in lieu of live testimony unless the state has made a good faith effort to secure the witness' presence. *Id.* at 721. The Court noted that "one of the most important objects of the right of confrontation [is] to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses." *Berger*, 393 U.S. at 315.

In the decade and a half since *Teague*, the Supreme Court has yet to be confronted with a rule akin to those presented to the Court in *Gideon*, *Robinson*, *Witherspoon, Bruton,* and *Berger*. Rather, the Court has been asked to rule on sentencing issues which invoke either Eighth Amendment rights in the context of capital cases or the division between judge and jury in fact-finding. The Court's refusal to apply these types of new rules retroactively is consistent with its pre-*Teague* practice. In contrast, the rule presented in *Crawford* is much more analogous to those pre-*Teague* cases (*Gideon*, *Robinson*, *Witherspoon, Bruton,* and *Berger*) which the Court found articulated new rules meriting retroactive application. A holding that *Crawford* articulates a watershed rule in criminal procedure is entirely consistent with the Supreme Court's historical retroactivity jurisprudence. *See supra*.

## D.     *Crawford* **as a Watershed Rule**

### 1.     *The Circuit Split*

Several circuit courts of appeal have addressed the retroactivity of *Crawford*. The Second, Tenth, and Seventh Circuits have held that *Crawford* does not apply retroactively. The Ninth Circuit has held that Crawford does apply retroactively and that AEDPA does not bar such retroactive application.

The Second Circuit held in *Mungo v. Duncan*, 393 F.3d 327, 335-36 (2d Cir. 2004), *cert. denied sub. nom. by Mungo v. Greene,* 125 S.Ct. 1936 (2005), that *Crawford* does not merit retroactive application. The Second Circuit noted that the question turned on "whether the rule is necessary to the fundamental fairness, and improves the accuracy, of criminal proceedings." *Id.* at 335. The court then reasoned that the rule would preclude some unreliable testimony but would also work to exclude previously admissible testimony which bore significant indicia of reliability. The Second Circuit therefore concluded that the *Crawford* rule would not "improve the accuracy of the trial process overall" and held *Crawford* to be a prospective rule only. *Id.* at 336. The Seventh Circuit employed similar reasoning in also holding that *Crawford* was not a watershed rule of

criminal procedure. *See Bintz v. Bertrand*, 403 F.3d 859, 867 (2005), *cert. den'd by* 126 S.Ct. 174 (2005).

The Tenth Circuit also held in *Brown v. Uphoff*, 381 F.3d 1219 (2005), *cert. den'd by* 125 S.Ct. 940 (2005), that *Crawford* does not apply retroactively. The Tenth Circuit did not reach the merits of the retroactivity doctrine, but held that AEDPA precluded habeas relief on the basis of any federal law made clear only *after* the date of the state court decision. *Id.* at 1224 (reasoning that a "new rule" under *Teague* was presumptively not "clearly established federal law" at the time of the state court decision). In their decisions denying retroactivity, neither the Second nor Seventh Circuits addressed whether AEDPA would independently preclude application of a new rule retroactively.[2]

The Ninth Circuit, in *Bockting v. Bayer*, No. 02-15866, 2005 U.S. App. LEXIS 9973 (9th Cir. June 1, 2005), *rehr'g en banc den'd by* 2005 U.S. App. LEXIS 16797 (9th Cir. Aug. 11, 2005), found *Crawford* to merit retroactive application. The Ninth Circuit looked to the Supreme Court's most recent treatment of retroactivity analysis in *Schriro* for lessons in determining the existence of a watershed rule from *Crawford*. *Bockting*, 2005 U.S. App. LEXIS 9973, at *14. The Ninth Circuit looked to Justice Scalia's extensive treatment of the history and centrality of confrontation to our system of justice to conclude that confrontation is a fundamental precept of our legal regime. *Id.* at *15. The Ninth Circuit then looked to the Supreme Court's historical treatment of the Confrontation Clause, and the language accompanying its many Confrontation Clause cases, to determine that "[t]he Supreme Court has repeatedly and without deviation held that the purpose of the Confrontation Clause is to promote accuracy." *Id.* at *18. The Ninth Circuit reasoned that *Schriro*'s question of whether the absence of confrontation "so seriously diminish[es] accuracy" was answered by *Crawford* itself. *Id.* at *21. The Ninth Circuit pointed to language in *Crawford* addressing the *Roberts* rule as "so unpredictable that it fails to provide meaningful protection from even core confrontation violations." *Id.* at *21.

The Ninth Circuit concluded its analysis in *Bockting* by again echoing the language of the *Crawford* decision in noting that the "Confrontation Clause . . . reflects a judgment . . . about how reliability can best be determined." *Id.* at *22 (quoting *Crawford*, 124 S.Ct. at 1370). The court considered the Second Circuit's contrary conclusions – that the *Crawford* rule does not improve overall accuracy – as an impermissible superimposition of that court's own analysis over that of the Supreme Court and the Constitution itself. *Id.* at *28 ("The flaw in this analysis is that the Second Circuit has substituted its judgment of whether the *Crawford* rule is one without which the accuracy of conviction is seriously diminished, for the Supreme Court's considered judgment.")

### 2.        Crawford *Merits Retroactive Application*

The *Teague* analysis requires this Court to 1) determine whether *Crawford* announced a new rule, 2) determine whether that rule was a "watershed rule" in criminal procedure, 3) apply the rule in the case at bar (if the rule is found to be retroactive), and 4) determine whether any resulting error was harmless. Because Ash's statement falls squarely within the facts of *Crawford*, the parties do not dispute the statement's inadmissibility under *Crawford*.[3]

---

[2] The First Circuit declined to reach the question of *Crawford*'s retroactivity in *Horton v. Lane* because the court there found that the statements at issue did not implicate *Crawford* in the first instance. *See* 370 F.3d 75, 83 (2004). In setting up its analysis, however, the First Circuit implied that AEDPA would not preclude retroactive application when the court stated that "new rules of criminal procedure" applied in habeas cases when such rules fell within a *Teague* exception. *Id.*

[3] The central issue guiding the applicability of *Crawford* would be whether or not the statement was testimonial. While the *Crawford* Court declined to define the boundaries of testimonial statements, it held that a "core" class of testimonial statements includes "custodial examinations," which the parties do not dispute was the circumstance of Ash's statement. *Crawford*, 124 S.Ct. at 1364.

a.       *Crawford* announced a new rule

Whether Crawford's rule is new depends on whether the result was "dictated by the then-existing precedent." *Beard*, 124 S.Ct. at 2511. The *Crawford* Court observed that the rule of *Roberts* had proven too nebulous a standard for proper application; the Court further noted that "*Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears particularized guarantees of trustworthiness." *Crawford*, 124 S.Ct. at 1369. The Court then departed from precedent and held that testimonial statements may not be admitted against a criminal defendant absent unavailability of the declarant and the right of confrontation. The *Crawford* test eliminated the ability of a court to assess "particularized guarantees of trustworthiness" of testimonial statements and admit them absent constitutional confrontation. Past precedent, therefore, did not dictate the result in *Crawford*. Rather, *Crawford* overruled the *Roberts* test for testimonial statements.

Every circuit court to address *Crawford* has found that *Crawford* sets forth a new rule. *See Bockting*, 2005 U.S. App. LEXIS 9973, at *9-13; *Bintz*, 403 F.3d at 866; *Brown*, 381 F.3d at 1226; *Evans v. Luebbers*, 371 F.3d 438, 444-45 (8th Cir. 2004) (treating *Crawford* as creating a new rule but finding the case inapplicable); *Horton*, 370 F.3d at 83. *Crawford* therefore announces a "new rule."

b.       *Crawford* is a "watershed rule"

The Ninth Circuit's analysis is compelling. *Teague* demands that a watershed rule go to "procedures implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 307. A "watershed rule" is a rule which goes to the "fundamental fairness and accuracy of the criminal proceeding." *Saffle*, 494 U.S. at 495. The procedure at issue would be "central to an accurate determination of innocence or guilt . . . ." *Teague*, 489 U.S. at 313. "That the new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is seriously diminished.'" *Schriro*, 125 S.Ct. at 2523 (quoting *Teague*, 489 U.S. at 313). "A rule that qualified under this [watershed rule] exception must not only improve accuracy, but also 'alter our understanding of the bedrock procedural elements' essential to the fairness of a proceeding." *Sawyer*, 497 U.S. at 242 (quoting *Teague*, 489 U.S. at 311).

The Ninth Circuit efficiently summarized the Supreme Court's extensive discussion over the years on the role of the Confrontation Clause in the American criminal justice system.

The Supreme Court has repeatedly and without deviation held that the purpose of the Confrontation Clause is to promote accuracy. *See, e.g.*, *Crawford*, 124 S. Ct. at 1370 ("This open examination of witnesses . . . is much more conducive to the clearing up of truth.") (quoting 3 Blackstone, Commentaries * 373); *White v. Illinois*, 502 U.S. 346, 355 . . .(1992) (evaluating a Confrontation Clause claim against the benchmark of accuracy; *Tennessee v. Street*, 471 U.S. 409, 415 . . . (1985) (describing the "Confrontation Clause's very mission" as "to advance the accuracy of the truth-determining process in criminal trials") (internal quotation omitted); *Ohio v. Roberts*, 448 U.S. 56, 65 . . . (1980) (stating the purpose of the Confrontation Clause is to "augment accuracy in the factfinding process"); *Parker v. Randolph*, 442 U.S. 62, 73 . . . (1979) (plurality) ("The right of confrontation conferred by the Sixth Amendment is a safeguard to ensure the fairness and accuracy of criminal trials."); *Chambers v. Mississippi*, 410 U.S. 284, 295 . . . (1973) ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'"); *Dutton v. Evans*, 400 U.S. 74, 89 . . . (1970) (plurality) ("The decisions of this Court make it clear that the mission of the Confrontation

Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials . . . ."); *Pointer v. Texas*, 380 U.S. 400, 404 . . . (1965) ("Probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."); *Mattox v. United States*, 156 U.S. 237, 242-43 . . . (1895) (describing the "primary object" of the Confrontation Clause as "to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief"). *See also* M. Hale, *History and Analysis of the Common Law of England* 258 (1713) (adversarial testing "beats and bolts out the Truth much better") (quoted in *Crawford*, 124 S. Ct. at 1370).

"[T]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. The word 'confront,' after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness." *Maryland v. Craig*, 497 U.S. 836, 845 . . . (1990) . . . . "[T]he combined effect of these elements of confrontation – physical presence, oath, cross-examination, and observation of demeanor by the trier of fact – serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* at 846 . . . .

*Bockting*, 2005 U.S. App. LEXIS 9973, at \*18-21.

The Second and Seventh Circuits' rejection of Crawford's retroactivity is critically flawed. Both Circuits dispute the presumption inherent in the Constitution itself. As Justice Scalia noted, the Confrontation Clause *demands* that the reliability of a statement be determined via confrontation, and not by any independent judicial determination. *Crawford*, 124 S.Ct. at 63. The Confrontation Clause "commands, not that the evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." *Id.* Any determination, by any court, that compliance with the Confrontation Clause requirements fails to go to the accuracy of the criminal proceeding is therefore a direct contradiction of the Clause itself and a unreasonable interpretation of the Constitution.

### c.    AEDPA does not preclude application

The Tenth Circuit reasoned that AEDPA precludes the retroactive application of any new rule in criminal procedure because § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Tenth Circuit's reasoning fails, however, to look beyond subsection (d) of § 2254 or consider the normal implications of retroactivity.

The Supreme Court has directed lower courts to undertake both an AEDPA inquiry and a *Teague* inquiry in retroactivity cases, *Horn*, 536 U.S. at 272, impliedly endorsing the application of *Teague* in the AEDPA context. This interpretation of Supreme Court direction appears consistent with congressional intent. An analysis of the entirety of § 2254 shows that Congress contemplated retroactive rules in the habeas context. Section 28 U.S.C. § 2254(e) explicitly provides for their application in proceedings involving state habeas petitions. "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. § 2254(e). Because § 2254(e) supplements the operation of § 2254(d), Congress must have considered that habeas relief could be granted on the basis of retroactive rules.

The Tenth Circuit's perspective also ignores the normal implications of retroactivity analysis. Applying *Crawford* retroactively would make *Crawford* the "clearly established law at the time," albeit only as a legal construct, but that is always the consequence of retroactive application and why the courts invoke the doctrine only sparingly. Therefore the appropriate analysis in this case is under *Crawford* and not *Ohio v. Roberts*. The Supreme Court of Kentucky relied on its own test under *Taylor* to admit testimonial statements from Ash against Petitioner without a right to confrontation. Under *Crawford*, Petitioner should have been able to cross-examine any testimonial witness, and absent confrontation, the admission of Ash's statement was error. Therefore the Supreme Court of Kentucky's decision was "contrary to" established Supreme Court precedent in *Crawford*, as applied retroactively under *Teague* and *Schriro*.

## E.        The Error Was Not Harmless

A Confrontation Clause violation is cause for federal habeas relief only if it has "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). This Court has held that the *Brecht* standard survived the enactment of AEDPA, because "if a petitioner can pass *Brecht* analysis, 'he will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt . . . resulted from an unreasonable application of [federal law].'" *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) (quoting *Nevers v. Killinger*, 169 F.3d 352, 371-72 (6th Cir. 1999)).

Several factors inform this Court's analysis about whether such substantial or injurious effect or influence exist in the context of a Confrontation Clause claim, including:

'[1] the importance of the . . . testimony in the prosecution's case,
[2] whether the testimony was cumulative,
[3] the presence . . . of evidence corroborating or contradicting the testimony of the witness on material points,
[4] the extent of cross-examination otherwise permitted, and . . .
[5] the overall strength of the prosecution's case.'

*Madrigal v. Bagley*, 413 F.3d 548, 552 (6th Cir. 2005) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). If this Court is in "grave doubt" as to whether the error was harmless, it should "treat the error, not as if it were harmless, but as if it affected the verdict." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

The evidence presented at Petitioner's trial was not overwhelming. The prosecutor relied on 1) testimony from several inmates, who testified that Petitioner inculpated himself to them while in jail; 2) Terry Wright, who testified that Petitioner, and not Wright, actually killed Bramer; and 3) Ash's statement, which linked Petitioner to the crime scene through the statements about blood on Petitioner's clothes and the key. Ash's statement therefore played a key role in the prosecution's case.

Respondent contends that Ash's statement was cumulative because Wright testified to Petitioner's actions at the crime scene and to the key found near Petitioner's home. But without Ash's statement, a jury would have been inclined to regard Wright's statement with a great deal of skepticism. Wright admitted to being a drug dealer and to helping others steal from the victim in previous burglaries. Physical evidence actually linked Wright to the crime more than Petitioner; the police actually discovered the victim's blood on Wright's clothes, physical evidence that the police did not have on Petitioner. Wright therefore had a very strong and clear motive to exculpate himself while inculpating Petitioner.

The only other evidence introduced at trial consisted of testimony from jailhouse snitches that Petitioner had admitted the crime to them. A jury would normally view testimony from inmates housed with Petitioner with some skepticism. *See Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) (noting the unreliability of "jailhouse snitches"). The jury's deliberations further indicate that the jury placed some weight on Ash's statement. The jury began deliberations on April 22, 2004. On the afternoon on April 23rd, the jurors asked to have the tape of Ash's statement and a tape recorder. The judge played the tape for the jurors. Within an hour of hearing the tape the jury returned its guilty verdict. Given the lack of physical evidence in the case, and that without Ash's statement, the government's chief evidence would have come from an admitted accomplice and jailhouse snitches, this Court can only be left with "grave doubts" about the influence and effect of the improper introduction of the tape at trial.

## III.

### *ROBERTS* ANALYSIS

The lead opinion is correct that even absent the application of *Crawford*, the introduction of Ash's taped statement was contrary to clearly established law at the time and therefore would require that we grant the requested writ under normal AEDPA analysis. I write separately here because I believe that *Crawford* retroactivity is a threshold matter and that review of the statement under *Ohio v. Roberts* should only follow if *Crawford* is found not to be a watershed rule of criminal procedure.

### A.    The AEDPA Standard

AEDPA "requires heightened respect for state court factual and legal determinations." *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "'[C]learly established Federal law, as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Williams v. Bagley*, 380 F.3d 932, 942 (6th Cir. 2004) (quoting *Williams*, 529 U.S. at 412).

## B.      The Supreme Court of Kentucky Opinion

In denying relief for Petitioner under the Confrontation Clause, the Supreme Court of Kentucky determined that Ash's statement bore sufficient indicia of reliability under a Kentucky high court test as set forth in *Taylor v. Commonwealth*, 821 S.W.2d 72, 74 (Ky. 1991). The *Taylor* decision drew on an earlier Supreme Court of Kentucky decision,[4] which in turn purported to interpret the United States Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973), as establishing criteria for use in determining when a statement against penal interest is admissible against a criminal defendant without violating the Confrontation Clause. *See Taylor*, 821 S.W.2d at 74. The *Taylor* decision set forth four criteria for consideration by Kentucky courts faced with a request to admit, against a criminal defendant, an out-of-court statement by an accomplice as a statement against the accomplice's penal interest:

(1) [t]he time of the declaration and the party to whom made;
(2) the existence of corroborating evidence in the case;
(3) the extent to which the declaration is against the declarant's penal interest[;] and
(4) the availability of a declarant as a witness.

*Id.*

The Supreme Court of Kentucky applied this test to Petitioner's case. The court found the following to support the statement's admission:

1)      "[T]he time of the declaration [shortly after the crime] and the party to whom it was made [the police] are indeed indicative of the statements' trustworthiness." (J.A. at 100.)

2)      The court then noted that "the key – which police found where Ash said it would be – was sufficient corroborating evidence." (J.A. at 101.)

3)      The court found Ash's statement as to the key was buttressed by the testimony of Petitioner's accomplice at trial.

4)      The court found additional corroboration of Ash's statement in the actual crime scene, which would indicate that Petitioner would have had blood on his clothes.

5)      Finally, the court found that the statement was assuredly "against Ash's penal interest," inasmuch as she was in a custodial setting, had been read her *Miranda* rights, was aware that

---

[4] *Crawley v. Commonwealth*, 568 S.W.2d 927 (Ky. 1978).

the police were investigating a murder, and would have known her actions, as disclosed to the police, helped Petitioner dispose of the fruits of a crime and evidence.

The Supreme Court of Kentucky concluded its Confrontation Clause analysis by noting that it was not an abuse of discretion for the trial court to admit Ash's taped statement when an "objective measure of whether [the statement] was against [Ash's] penal interests" supported the trial court's decision. (J.A. at 102.)

## C.     The *Taylor* Test Is Contrary to Clearly Established Federal Law

The *Taylor* test is "contrary to clearly established Federal law" when used to evaluate the admissibility of an out-of-court, mutually inculpatory statement. The United States Supreme Court has *ruled explicitly* that independent corroborating evidence *may not be used* as indicia of reliability when determining whether an out-of-court statement is sufficiently trustworthy to admit against a criminal defendant.[5] *See Idaho v. Wright*, 497 U.S. 805, 819 (1990).[6] The *Wright* court devoted considerable space to explaining why the "use of corroborating evidence to support a hearsay statement" infringes on Confrontation Clause guarantees:

> [W]e are unpersuaded by the State's contention that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness.' To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial . . . . [T]he use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the . . . Confrontation Clause . . . . The true danger inherent in this type of hearsay [hearsay from a co-defendant] is, in fact, its selective reliability . . . . There is a very real danger that a jury will rely on partial corroboration to mistakenly infer the trustworthiness of the entire statement.

*Id.* at 823-24. Such explicit exposition on the law and its rationales made the contours of Confrontation Clause jurisprudence very clear in 1996, at least insofar as the (impermissible) use of corroborating evidence to "bootstrap" the reliability of hearsay was concerned.[7]

---

[5] Respondent appears to argue that the *Taylor* decision is consistent with Supreme Court precedent if read as setting forth a test to determine whether a statement actually is a statement against penal interest, and that such statements are, in turn, firmly rooted hearsay exceptions. Respondent does, in fact, imply in its brief to this Court that the *Wright* decision is inapplicable because the *Wright* court was dealing with the admissibility of a statement under the residual hearsay exception. (*See* Resp. Br. 25.) This argument fails for two reasons. First, whether admitted as either a statement against penal interest or under the residual exception, a declaration must pass the test set forth in *Ohio v. Roberts* (*see infra*) to preclude a Confrontation Clause violation. A statement can only pass *Roberts* if it 1) is a firmly rooted hearsay exception (and hence so traditionally trustworthy that individual case analysis is unnecessary), or 2) possesses its own particularized indicia of reliability. A statement against penal interest was not a firmly rooted hearsay exception in 1996, *see infra*; therefore such statements must be analyzed under *Roberts'* second prong, making applicable the 1990 *Wright* decision, which analyzed the admitted statement under *Roberts*' second prong. Second, the *Taylor* test, *a fortiori*, purports to set forth an analysis of when a statement against penal interest is trustworthy enough to merit admission without Confrontation Clause problems, both because of the posture of the case and the test itself, which includes consideration of the declarant's penal interest as only *one factor* in the overall test.

[6] The *Wright* decision came out on June 25, 1990, while the Kentucky *Taylor* decision came more than two months later, on June 27, 1990.

[7] While the Supreme Court cited to *Wright* several times in decisions issued between 1990 and 1995, no majority opinion called the *Wright* decision into question.

Respondent cites to *Early v. Packer*, 537 U.S. 3, 8 (2002), for the proposition that a state court need not cite, or even be aware of, Supreme Court precedent, so long as "neither the reasoning nor the result of the state-court decision contradicts them." (Resp. Br. 23.) But the reasoning – *i.e.*, the *Taylor* test – used by the Kentucky high court here *directly contradicts* clearly established Supreme Court precedent. Moreover, this is not the first time that this Court has encountered a Kentucky state court relying on *Taylor* to admit an accomplice's mutually inculpatory statements against a criminal defendant. In *Vincent v. Seabold*, 226 F.3d 681 (6th Cir. 2000), this Court held that the trial court's reliance on *Taylor* resulted in a result "contrary to" clearly established Supreme Court precedent, *id.* at 684-85, 689. While the *Vincent* panel did not elaborate on the particulars of the *Taylor* test, its ultimate finding demonstrates the constitutional infirmity of *Taylor*'s ongoing application by the Kentucky courts in these circumstances.

Because the Supreme Court of Kentucky used a legal standard manifestly "contrary to" clearly established federal law, this Court reviews the admissibility of Ash's statement *de novo*. *Williams*, 529 U.S. at 413 ("Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of law . . . ."); 28 U.S.C. § 2254(d)(1).

**D.      Ash's Statement Was Inadmissible Under *Roberts***

"In *Ohio v. Roberts*, the Supreme Court set forth 'a general approach for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause.'" *Wright*, 497 U.S. at 815 (citing *Ohio v. Roberts*, 448 U.S. 56, 65 (1980)). *Roberts* set forth two ways in which the "indicia of reliability" requirement could be met:

1)      where the hearsay statement "falls within a firmly rooted hearsay exception," or

2)      where it is supported by "a showing of particularized guarantees of trustworthiness."

*Id.* at 816 (citing *Roberts*, 448 U.S. at 66); *see also Lee v. Illinois*, 476 U.S. 530, 543 (1986) ("Even if certain hearsay evidence does not fall within 'a firmly rooted hearsay exception' and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'") (footnote and citation omitted).

*1.      Statement Against Penal Interest Is Not a Firmly Rooted Hearsay Exception*

Respondent argues that a statement against penal interest is, alternatively, either a "firmly rooted hearsay exception," or that the state of the law in 1996 was ambiguous enough to preclude this Court from finding that a state court's determination as such in 1996 was "contrary to" clearly established Supreme Court precedent. At this stage of this analysis, however, this Court has established that the Supreme Court of Kentucky's application of the *Taylor* criteria was "contrary to" clearly established precedent. *See supra*. AEDPA, therefore, does not require that this Court defer to the Supreme Court of Kentucky's reasoning or conclusions on this issue inasmuch as they pertain to matters of constitutional law. Rather, this Court analyzes the admissibility of the statement *de novo*, treating the *Roberts* analysis as the first step in its harmless error review – *i.e.*, was the Supreme Court of Kentucky's application of a constitutionally infirm test merely "harmless error"? That is, would the admissibility of the statement have been upheld under the correct legal theory? If we find the statement inadmissible, we next ask whether the improper admission undermines confidence in the outcome of the trial.

"Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Wright*, 497 U.S. at 817.

A hearsay exception is "firmly rooted" if, in light of "longstanding judicial and legislative experience," *Wright*, 497 U.S. at 817, it "rests [on] such [a] solid foundation that admission of virtually any evidence within [it] comports with the 'substance of the constitutional protection.'" *Roberts*, 448 U.S. at 66 (quoting *Mattox v. United States*, 156 U.S. 237, 244 (1895)). A "firmly rooted" hearsay category has conditions which have proven over time "to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath" and cross-examination at a trial. *Mattox*, 156 U.S. at 244. The Supreme Court has found spontaneous declaration firmly rooted, for example, because the exception "is at least two centuries old, currently widely accepted among the States," and carries "substantial guarantees of . . . trustworthiness . . . [that] cannot be recaptured even by later in-court testimony." *White v. Illinois*, 502 U.S. 346, 355-56 n.8 (1992). Established practice, in short, must confirm that statements falling within a category of hearsay inherently "carry special guarantees of credibility" essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony. *Id.* at 356.

This Court has found, on several occasions, that *a statement against penal interest is not a firmly rooted hearsay exception*, at least insofar as the exception is used to admit a declarant's mutually inculpatory statement against a criminal defendant. *See Hill*, 337 F.3d at 715-16 (finding state court's reliance on a statement against penal interest as a clearly established hearsay exception "contrary to" clearly established federal law); *see also United States v. McCleskey*, 228 F.3d 640, 644 (6th Cir. 2000) ("[I]t is clear that Supreme Court Confrontation Clause jurisprudence does not permit the introduction of hearsay declarations uttered by accomplices in law enforcement custody that inculpate a defendant, absent further 'particularized guarantees' of the declaration's trustworthiness."). *Compare Calvert v. Wilson*, 288 F.3d 823, 837-38 (6th Cir. 2002) (finding a declarant's mutually inculpatory statement inadmissible against a third-party criminal defendant), *with Neuman v. Rivers*, 125 F.3d 315, 319-20 (6th Cir. 1997) (finding statements against penal interest firmly rooted *when admitted against the declarant*). Moreover, this Court has found that it was clearly established, prior to the Supreme Court's 1999 *Lilly* decision, that such statements were not firmly rooted hearsay exceptions in light of the Supreme Court's precedents in *Douglas* (1965),[8] *Bruton* (1968),[9] and *Lee* (1990). *See Hill*, 337 F.3d at 715-16. Even were this Court to get past Kentucky's application of the *Taylor* factors and apply the deferential AEDPA standard of review, then, Respondent's argument would still fail because admitting an inculpatory statement, not against

[8] In *Douglas v. Alabama*, 380 U.S. 415 (1965), the Supreme Court held that the admission of a nontestifying accomplice's confession, which shifted responsibility and implicated the defendant as the triggerman, "plainly denied [the defendant] the right of cross-examination secured by the Confrontation Clause." *Id.* at 419. A quarter century later, in *Lee*, the Court reaffirmed *Douglas* and explained that "the truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination . . . . Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." *Lee*, 476 U.S. at 544 (internal quotations and citations omitted). The *Lee* Court recognized that due to the sweeping scope of the label, the simple categorization of a statement as a "'declaration against penal interest' . . . defines too large a class for meaningful Confrontation Clause analysis." *Id.* at 544 n.5.

[9] In *Bruton v. United States*, the Supreme Court unanimously found that a codefendant's mutually inculpatory confession could not be used against the declarant's accomplice without infringing on the defendant's rights under the Confrontation Clause. 391 U.S. at 138. In the years since *Bruton*, the Supreme Court has consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("Where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."); *Cruz v. New York*, 481 U.S. 186, 189-90, 193 (1987) (same).

the declarant, but against an accomplice, was "contrary to" clearly established Supreme Court precedent in 1996.[10]

> ### 2.          *Ash's Statement Bore Insufficient Indicia of Reliability*

The Supreme Court of Kentucky found Ash's statement reliable in light of:

1)      the timing of the declaration (shortly after the crime) and the party to whom it was made (the police),

2)      the fact that the police found the key where Ash indicated it would be,

3)      Petitioner's accomplice at trial corroborated Ash's version of the key request,

4)      the actual crime scene, which would corroborate that Petitioner would have had blood on his clothes; and

5)      that the statement was assuredly "against Ash's penal interest," inasmuch as she was in a custodial setting, had been read her *Miranda* rights, was aware that the police were investigating a murder, and would have known her actions, as disclosed to the police, helped Petitioner dispose of the fruits of a crime and evidence.

Of these elements, items 2 through 4 are impermissible considerations under *Roberts*, *Lee*, and *Wright*; rather, the only *inherent* features of the statement to which the Supreme Court of Kentucky pointed are the timing of the declarations, the facts that the statements were made to the police, and that parts of the statement inculpated Ash herself.

The first two factors actually *caution against* finding Ash's statements inherently trustworthy. The Supreme Court has found that custodial statements made in response to the police's leading questions, when the declarant is under some suspicion related to the crime under investigation, are *inherently untrustworthy*. *See Lee*, 476 U.S. at 544. Neither has the Supreme Court found the timing of a statement itself a sufficient indicator of reliability. *Id.* In fact, most accomplices are interviewed shortly after the crime. Here, about 10 days had passed. The fact that the statement was against Ash's penal interest does not distinguish the case from the Supreme Court's well-established jurisprudence finding that such custodial, mutually inculpatory statements are inherently untrustworthy. *Id.*

Nothing about Ash's statement bore "particular guarantees of reliability." The fact that a statement took place shortly after the crime is insufficient, standing alone, to overcome the presumption of unreliability accorded to statements which both inculpate the declarant and the criminal defendant in the same crime. Ash's statement did exactly what the Supreme Court fears such statements do – at the cost of some inculpability of the declarant, the declarant curries police favor, minimizes her own role, and inculpates another actor. *Id.* at 546. This suspicion is borne out

---

[10]The "against penal interest" exception to the hearsay rule is not premised on the traditional hearsay exception rationale; circumstances of the traditional hearsay exception indicate that it is made without a motive to reflect on the legal consequences of one's statement; and the situations in which the statement is made are exceptionally conducive to veracity and lack the dangers of inaccuracy that typically accompany hearsay. Rather, the "against penal interest" exception is founded on the broad assumption "that a person is unlikely to fabricate a statement against his own interest at the time it is made." *Chambers*, 410 U.S. at 299. But this rationale does not suppose that the declarant's unwillingness to inculpate himself extends to his accomplices or those who otherwise assisted or engaged in the crime. The practice of admitting mutually inculpatory hearsay statements is a relatively recent phenomenon of the past two decades. The reality of such statements, however, is that they typically include statements that, when offered in the absence of the declarant, function similarly to those used in the ancient *ex parte* affidavit system which the hearsay rule was designed to address.

in Ash's case. At the conclusion of her statement, the police assured Ash that she was not being looked upon as a suspect in the case – despite the fact that the police had placed Ash in custody and Mirandized her for questioning. (*See* J.A. at 57.) Ash was incentivized to tell the police what they wanted to hear. The Supreme Court of Kentucky pointed to no features of Ash's statement which would indicate that the statement bore "particularized guarantees of trustworthiness."

Respondent argues that Ash was not a codefendant to Petitioner, nor a true "accomplice" to Petitioner's alleged crime, thereby placing Ash's statement outside the bounds of Supreme Court case law which treats such statements as presumptively unreliable. Respondent points out that destruction of evidence is a separate crime in Kentucky law, and that Ash's statements therefore implicate Ash in a different crime than Petitioner's. Respondent's argument in this respect is without merit. Whether Kentucky state law treats Ash's actions as a separate crime or as something akin to an "accomplice after the fact," the basic premise making Ash's statement presumptively unreliable remains. Ash had an incentive to minimize her actions and to curry favor with the police. Whatever the state of Kentucky ultimately chose to charge Ash with for her role in destroying evidence relevant to the death of Charlie Bramer does not affect the presumptive unreliability of her statement made just 10 days after the crime itself. Because the introduction of the statement was not harmless error, *see supra*, under the rule of *Ohio v. Roberts* the writ must be granted.

**IV**.

**CONCLUSION**

Because *Crawford* is a watershed rule of criminal procedure, I would apply *Crawford* to find that the introduction of Ash's taped statement violated Petitioner's rights under the Confrontation Clause of the Sixth Amendment. Even absent the application of *Crawford*, however, I agree with the lead opinion that the Kentucky *Taylor* test was contrary to clearly established law under *Ohio v. Roberts*. Accordingly, the writ must be granted.