**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0370n.06

**No. 05-6653**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| OSCAR SMITH, | ) | |
| | ) | **FILED**<br>**Jun 18, 2010**<br>LEONARD GREEN, Clerk |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | MIDDLE DISTRICT OF TENNESSEE |
| RICKY BELL, Warden, Riverbend Maximum | ) | |
| Security Institution, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before: COLE, COOK, and GRIFFIN, Circuit Judges.

COOK, Circuit Judge. Oscar Franklin "Frank" Smith, a Tennessee prisoner sentenced to death, challenges his conviction for murdering his wife and two stepsons. Smith appeals from the district court's denial of his petition for a writ of habeas corpus, alleging ineffective assistance of his trial counsel and a government failure to disclose evidence. We affirm.

I. Background

The Tennessee Supreme Court opinion denying Smith's direct appeal adequately sets forth the facts underlying his conviction, *State v . Smith*, 868 S.W.2d 561, 565–68 (Tenn. 1993), and we draw from those facts here. At approximately 11:20 p.m. on Sunday, October 1, 1989, the police received a 911 call from Judy Smith's home. On the tape of that call (later technically enhanced for

trial) a victim shouts, among other things, "Frank, no. God, help me!" before the call abruptly ends.

Officers arrived at the house five minutes later, heard nothing, received no answer at the front door, and considered it a false call. The following afternoon, the bodies of Judy Smith, Frank Smith's estranged wife, and his two stepsons, Jason and Chad, were found dead. Smith's twin boys were elsewhere the night of the murders.

According to the medical examiner, the three victims died at least twelve hours before they were found. The killer used an awl, a knife, and a .22 caliber gun. Police found a bloody hand print on the sheet next to Judy's body. Sergeant Johnny Hunter, who examined the print, testified that it matched Smith's left hand, which was missing the two middle fingers.

Smith claimed that he spent Sunday, October 1, with Judy until 9:30 p.m., when he took the twins back to his home, 30 miles from Judy's. At approximately 11:00 p.m., though, a neighbor saw Smith's vehicle parked outside of Judy's house. His work required him to conduct business in Kentucky the next day, and Smith convinced his employer to let him depart Sunday night, rather than Monday morning as initially instructed. After leaving Judy's, Smith completed the 300-mile trip and visited the customer at 8:00 a.m., before returning to his home in the afternoon. When police officers picked him up later that same day, Smith never asked why he was being questioned. Even before officers told him of her death, Smith spoke of his wife in the past tense. He showed no emotion and had abrasions on his hand, elbow, back, and shoulder blade.

Testimony at trial revealed that Smith repeatedly threatened to kill and committed previous acts of violence against his victims. He fought with Jason, bit him, and held a gun to his head. He tied Judy up and raped her, ran a knife across her throat, and repeatedly called her work with death threats. He also threatened to kill Chad and Jason because Judy treated them better than his children, and he asked his coworkers to murder Judy and his stepsons, offering to pay them for the trouble. Other circumstantial evidence bolstered the case: a glove found at the scene resembled Smith's gloves; Smith owned a .22 caliber revolver, a large knife, and an awl; and Smith took out life insurance policies on Judy and his stepsons.

At trial, the prosecutor argued that Smith dropped off the twins around 10:30 p.m., drove back to his wife's home, murdered his victims, and then drove to Kentucky. Smith denied the State's allegations and presented an alibi defense, insisting that he drove directly to Kentucky after dropping off the twins. The jury accepted the prosecutor's version of events, convicting Smith of three counts of premeditated first-degree murder. The court adopted the jury's recommendation and sentenced him to death for each crime.

The Tennessee Supreme Court affirmed Smith's convictions and sentences on direct appeal. The state trial court denied his post-conviction petition, the Tennessee Court of Criminal Appeals affirmed, and the Tennessee Supreme Court denied Smith permission to further appeal. Smith then filed a habeas petition under 28 U.S.C. § 2254, alleging numerous constitutional violations. At an evidentiary hearing, his medical experts testified that the time of death could have been later than

fixed by the county medical examiner at trial, a topic that Smith's trial counsel neglected to explore. Crime scene investigator Hunter testified about the presence of an Alternate Light Source ("ALS") at the crime scene—something not disclosed in his trial testimony—although he could not recall whether he used the ALS at the crime scene. Hunter also admitted attending a pre-trial meeting with the prosecutor before conducting the laboratory testing that revealed a match between the bloody palm print and Smith. The district court ultimately dismissed Smith's petition as meritless. *Smith v. Bell*, No. 3:99-0731, 2005 WL 2416504 (M.D. Tenn. Sept. 30, 2005). This appeal followed. Smith raises two issues for which our court has granted a certificate of appealability: ineffective assistance of trial counsel in failing to investigate or challenge the time of death in support of his alibi claim; and a *Brady* violation concerning undisclosed details of the State's examination of the bloody hand print at the crime scene.

## II. Analysis

### A. Standard of Review

"We review the district court's legal conclusions *de novo* and its factual findings for clear error." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005). Under the Antiterrorism and Effective Death Penalty Act, we uphold a state court's resolution of a claim unless the court's decision was contrary to, or involved an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). As we later explain, because the state court used a standard contrary to Supreme Court precedent in resolving Smith's ineffective assistance claim, we do not defer to that court's judgment.

- 4 -

*Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006). Likewise, as Smith never raised his *Brady* claim in state court, we lack a state court decision to which we would defer and thus review Smith's *Brady* claim under our standards for procedural default. *Brown v. Smith*, 551 F.3d 424, 429–30 (6th Cir. 2008).

### B. Ineffective Assistance of Counsel as to Alibi

Smith first argues that the Tennessee Court of Criminal Appeals, *Smith v. State*, No. 01C01-9702-CR-00048, 1998 WL 345353, at *19–23 (June 30, 1998), and the district court, *Smith*, 2005 WL 2416504, at *47–48, erred in rejecting his claim that counsel failed to fully investigate and present evidence of a potential alibi. To establish ineffective assistance of counsel, Smith must demonstrate both a deficiency in counsel's performance and resulting prejudice that rendered the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We review his claim deferentially, presuming that counsel provided adequate assistance and exercised reasonable professional judgment. *Poindexter v. Mitchell*, 454 F.3d 564, 574–75 (6th Cir. 2006). Because the failure to investigate and present evidence of an alibi can constitute ineffective assistance, *Avery v. Prelesnik*, 548 F.3d 434, 437–38 (6th Cir. 2008), we focus here on whether Smith's counsel acted reasonably under the circumstances, *Mapes v. Tate*, 388 F.3d 187, 191 (6th Cir. 2004).

We review the last reasoned state-court opinion addressing the question, here issued by the Tennessee Court of Criminal Appeals. *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005). Smith

asserts an entitlement to habeas relief because that court applied a rule contrary to the governing law set forth in *Strickland*. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Smith is correct; the Tennessee court misstated *Strickland*'s prejudice prong by requiring him to establish "that, but for his counsel's deficient performance, the result of his trial would have likely been different," *Smith*, 1998 WL 345353, at *17, rather than using the "reasonable probability" language of *Strickland*. 466 U.S. at 693. In requiring Smith to prove "how the outcome of the trial would have differed," *Smith*, 1998 WL 345353, at *20–23, the state court applied an outcome-determinative approach that *Strickland* explicitly rejected. 466 U.S. at 693–94. This departure from Supreme Court law eliminates our deference to the prejudice portion of the court's decision, *Fulcher*, 444 F.3d at 799; but even under de novo review, Smith's ineffective assistance claim fails.

Smith asserts that, to support his alibi defense that he was in another state when the victims were killed, his counsel should have challenged the time-of-death evidence. The trial testimony of the county medical examiner fixed the time of the killings at approximately 11:30 p.m. on October 1. Smith argues that other evidence leads to the conclusion that the victims died sometime the following morning, when Smith can prove his presence in Kentucky. He identifies five facts—garnered from post-conviction experts—that tend to show that the victims died in the morning: (1) rigor mortis indicated that the victims died between 5:00 a.m. and 9:00 a.m. on October 2; (2) livor mortis showed that the victims died before 8:40 a.m. on October 2; (3) one of the victims' bodies had been moved after death; (4) police officers noticed lights on in the house at 11:30 p.m. on October 1, but off the next day; and (5) although officers heard no noise from the

house at 11:30 p.m. on October 1, a hair dryer was running when they discovered the bodies the next day. Both individually and cumulatively, the quality of this evidence fails to counter the time of death set by the medical examiner.

The relevant post-conviction testimony came from Drs. Kris Sperry and Walter Hoffman. To contest the medical examiner's conclusion at trial that the victims were killed around 11:30 p.m. (shortly after the 911 call), Dr. Sperry maintained that rigor and livor mortis indicated that the victims *could have* died several hours later. As rigor and livor mortis cannot demonstrate time of death reliably, Sperry suggested that Smith's counsel could have cross-examined the county medical examiner more thoroughly on the issue to Smith's benefit. But when cross-examined himself, Sperry acknowledged the absence of evidence to *contradict* the medical examiner's conclusion and admitted that he would reach a similar conclusion himself in light of the timing of the 911 call. Dr. Hoffman's testimony also attacked the reliability of the medical examiner's report and included his weak conclusion that the victims' time of death *could be* as late as 8:00 or 9:00 a.m.

This evidence fails to rebut the presumption that trial counsel acted reasonably under the circumstances when he chose not to contest the reliability of the medical examiner's report. The two doctors' testimony only vaguely challenges the medical examiner's view and thus fails to support Smith's alibi. What is more, Smith's counsel possessed a good reason not to further investigate the issue because the 911 call fixed the time of the attack so reliably that taking a contrary stand may

well have undermined counsel's credibility with the jury. *See Strickland,* 466 U.S. at 690–691 (reasonable professional judgment can support limits on investigations).

Moreover, even if Smith established counsel's deficiency in failing to investigate and present evidence concerning time of death, showing prejudice would have required Smith to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In other words, we look to "whether counsel's errors likely undermined the reliability of and confidence in the result." *Stanford v. Parker*, 266 F.3d 442, 455 (6th Cir. 2001).

Without evidence actually contradicting the prosecution's theory that the victims were killed in the evening as recorded on the 911 call, Smith cannot establish prejudice. At most, Sperry's testimony offers potential lines of questioning for cross-examination; but even Sperry admitted that the time of death set by the medical examiner appeared consistent with the medical evidence and the 911 call. And as for Hoffman, he claimed that the medical examiner lacked sufficient evidence to establish the time of death, but could not himself rule out a time of death contemporaneous with the call. Smith's ineffective assistance theory proceeds from the premise that his lawyer ought to have pressed the time-of-death issue in support of his alibi. The theory ultimately required, however, changing the time of the killing. And in light of the medical examiner's testimony, which the experts at the habeas hearing failed to discredit, and the other evidence, we find it could not succeed.

Nor do the remaining three of Smith's five facts demand a different conclusion. Though demonstrating that either the victims moved while dying or that the killer moved a body after death, or that lights were turned off sometime after the killing, may insert some mystery into the actual events at the victim's house that night, such evidence fails to counter the other time-of-death evidence so as to demonstrate a reasonable probability that the jury would find that the *killings* took place the next day. Assuming for argument's sake that Smith could overcome the adequate-performance presumption, he fails to satisfy *Strickland*'s prejudice prong.

### C. *Brady* Claim Relating to Sgt. Hunter's Testimony

Smith's *Brady* claim fixates on Sgt. Hunter's identification of the bloody palm print, asserting that Hunter's federal habeas testimony undermines his identification at trial. The district court denied this claim as untimely, procedurally defaulted, and without merit. *Smith*, 2005 WL 2416504, at *75–78.

Pursuant to 28 U.S.C. § 2244(d)(1)(A), a state prisoner generally must file a § 2254 petition within one year of when the conviction becomes final. Smith argues that Hunter's withholding of the "true" version of the palm print identification prevented him from bringing the claim sooner. Smith maintains he filed within one year of counsel's discovery of allegedly helpful facts related to Hunter's examination of the print such that he exercised the due diligence required by § 2244(d)(1)(D). *See Willis v. Jones*, 329 F. App'x 7, 17 (6th Cir. 2009). We agree that the state failed to respond to his pre-trial request for all *Brady* material with accurate information regarding

Hunter's analysis of the hand print—it was not until his counsel interviewed Hunter in 2003 that he discovered the "discrepancy." Thus, we find that Smith timely filed his *Brady* claim.

Smith must overcome an additional procedural bar to our review: AEDPA requires him to exhaust his state court remedies before bringing a claim in federal court. 28 U.S.C. § 2254(b)(1)(A). Where a petitioner fails to present his claims to a state court "and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,] . . . there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991). Tennessee's limit of one post-conviction petition to each inmate, Tenn.Code Ann. § 40-30-102(a), prevents Smith from now returning to state court to exhaust his *Brady* claim. Accordingly, we hold the claim procedurally defaulted.

A habeas petitioner can overcome procedural default by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Smith fails to argue that justice requires our review of his *Brady* claim, so we turn our attention to cause and prejudice. In order to determine if Smith has demonstrated cause, we ask whether a prosecutor suppressed evidence. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). By holding Smith's claims timely as a result of the prosecutor's suppression of *Brady* information, we necessarily conclude that Smith has demonstrated cause for his default. The prejudice inquiry tracks our analysis of the materiality of the evidence suppressed,

an element of a *Brady* claim itself, so we proceed to the merits. *See Bell v. Bell*, 512 F.3d 223, 231 n.3 (6th Cir. 2008) (en banc).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. Prejudice, in this context, means "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks omitted). We assess the withheld evidence collectively when determining its materiality, *Apanovitch v. Houk*, 466 F.3d 460, 475 (6th Cir. 2006), and consider the available evidence supporting Smith's convictions when assessing prejudice, *see Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004).

Because Sgt. Hunter had access to an ALS at the crime scene, Smith surmises that Hunter tested the bloody sheet at the scene with the ALS and found that the sheet offered no useable print, but later performed the same test with the same device at his lab and produced a positive identification. Pet'r Br. at 9–10. Thus, Smith concludes that the second, identification-producing test should be viewed skeptically, particularly in light of Hunter's testimony that he attended a pre-trial conference before testing the sheet in the lab. Smith speculates that the prosecutor gave specific instructions to reexamine the evidence, thus generating the tainted (in Smith's opinion) lab

identification of the print on the sheet. *Id*. He offers these conjectures to buttress his *Brady* claim: the prosecution failed to disclose the ALS's presence at the scene; Hunter tested the sheet at the scene with the ALS; and a meeting with the prosecution prompted Hunter's testing (or re-testing) of the sheet. But Smith misconstrues Sgt. Hunter's testimony. Hunter did not change his story; he never stated that he tested the sheet at the scene with the ALS or that the prosecutor ordered a re-evaluation of the evidence because of weaknesses in the case. The federal hearing testimony revealed only that Hunter's memory of the events faded over time, not that the State withheld exculpatory evidence. Fed. Evid. Hr'g Tr. at 68, 71, 72, 73, 93, 95, 130.

Even if the State failed to reveal the presence of the ALS at the scene or the details of the pre-trial meeting, Smith suffered no prejudice because this information lacks any significant impeachment value. Though Hunter testified at the federal evidentiary hearing that he did not remember certain details from the investigation, he also provided convincing answers to rebut Smith's allegations. To him, the bloody hand print initially looked like only a partial print. But after noticing later that Smith was missing two fingers, Hunter realized that the print was, in fact, a complete print of a three-fingered hand. Fed. Evid. Hr'g Tr. at 86, 94. Moreover, Hunter accounted for the difference between the results of his initial investigation and later testing:

> My initial opinion was when I looked at it on the bed, there was not enough ridge detail in it to make any type of comparison. Once I used the alternative light source and the Polaroid camera, the MP-4, I was able to photograph it [in the laboratory for magnification] and pull out of the ridge detail that was actually needed in that case to be able to make an identification.

*Id*. at 102–103.  The ALS at the scene lacked the magnification needed for a proper identification, necessitating this additional work in the lab.  *Id*. at 92, 104.  In fact, Hunter described this as commonplace, explaining that: "We use [the ALS] in the laboratory more than we use it on the crime scene."  *Id*. at 121.  Furthermore, Hunter described the pre-trial conference between police officers and prosecutors to review evidence before a major case goes to trial as a standard operating procedure.  *Id*. at 87.

To demonstrate prejudice, Smith focuses on the prosecutor's closing argument, which highlighted Sgt. Hunter's palm print identification and described that evidence as unrebutted and sufficient on its own to convict.  The testimony from the federal hearing—that Hunter attended a pre-trial conference and cannot remember whether he examined the sheet with an ALS at the scene—fails to establish a reasonable probability that, had the State timely disclosed it to the defense, the result of Smith's trial would have differed.  Hunter's convincing explanations for the superiority of laboratory testing with magnification and description of meetings with prosecutors as normal eliminate any basis for the state trial court to exclude Hunter's testimony or for the jury to disbelieve him.  Moreover, other evidence supports Smith's convictions—especially the 911 call, his repeated threats against the victims, and his solicitation of others to murder his family—further reducing the probability of a changed outcome.

Finally, Smith asserts that the lack of disclosure affected his sentencing, as it could have raised residual doubt—a non-statutory mitigating factor under Tennessee law.  *State v. Rimmer*, 250

S.W.3d 12, 23 (Tenn. 2008).  That Hunter brought an ALS to the crime scene or attended a meeting

before making a successful identification in the lab, however, does not suffice to raise residual doubt

about Smith's convictions given the strong evidence against him.  Therefore, because Smith cannot

demonstrate prejudice, his *Brady* claim remains procedurally defaulted.

### III.  Conclusion

Accordingly, we affirm the judgment of the district court.